**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:17-cv-02278-RBJ


KEVIN HARTWELL,
BARBARA HARTWELL,

      Plaintiffs,

v.

CORRECTIONAL MEDICAL GROUP COMPANIES INC., d/b/a SOUTHWEST
CORRECTIONAL MEDICAL GROUP, LLC, d/b/a SOUTHWEST CORRECTIONAL
MEDICAL GROUP PLLC, d/b/a COLORADO CORRECTIONAL MEDICAL GROUP, PLLC,
DOUGLAS COUNTY,
SHERIFF TONY SPURLOCK, in his individual and official capacity,
CAPTAIN KEVIN DUFFY, in his individual and official capacity,
TIMOTHY G. MOSER, MD, in his individual and official capacity,
SOPHIA NIX, LPN, in her individual and official capacity,
DAISHA WADE, LPN, in her individual and official capacity,
STEPHANIE RUSSAK, RN, CHARGE NURSE, in her individual and official capacity,
JESSICA ISAACS, RN, in her individual and official capacity,
DEIMYS VIGIL, RN, in her individual and official capacity,

      Defendants.

_____

**FIRST AMENDED COMPLAINT AND JURY DEMAND**
_____

      COME NOW, Plaintiffs Kevin Harwell and Barbara Hartwell, by and through their

attorneys Galen Trine-McMahan of Metier Law Firm, LLC, and Cheryl Trine of Trine Law Firm

LLC, allege and complain as follows:

**<u>JURISDICTION</u>**

      1.     This is a civil action for damages and attorney's fees and costs, for the violation of

Plaintiff Kevin Hartwell's civil rights.  Jurisdiction is invoked under Title 42 U.S.C. §§ 1983 and

1988, and the Fourteenth and Eighth Amendments to the Constitution of the United States.

1

2.     This Court has supplemental jurisdiction to consider state causes of action under 28 U.S.C.A. §1367, the ancillary state claims which "form part of the same case or controversy" as other counts for which this Court has established jurisdiction.

## VENUE

3.     Venue properly lies in the District of Colorado pursuant to 28 U.S.C. §1391(b).

## PARTIES

4.     The Plaintiffs, Kevin and Barbara Hartwell, are residents of Colorado and citizens of the United States.

5.     At all times material hereto, Defendants Sheriff Spurlock, Captain Duffy, Dr. Moser, and the Defendant nurses were residents of Colorado and citizens of the United States.

6.     At all times material, Southwest Correctional Medical Group, PLLC, (SWCMG) is a private, for profit Texas Corporation registered to do business in Colorado, with a principal place of business at 2511 Garden Road, Suite A160, Monterey, CA 93940.   At all times material, Southwest Correctional Medical Group LLC, (SWCMG) was a private, for profit Delaware Corporation registered to do business in Colorado with the same principal place of business as Southwest Correctional Medical Group PLLC.

7.     At all times material, Colorado Correctional Medical Group PLLC (CCMG) was incorporated in Colorado, with a principal place of business at 2511 Garden Road, Suite A160, Monterey, CA 93940.

8.     At all times material, Correctional Medical Group Companies Inc. (CMGC), is located in 12220 El Camino Real, Suite 310, San Diego, CA 92130, and is doing business in Colorado as Southwest Correctional Medical Group, LLC and/or as Southwest Correctional Medical Group, PLLC, and as Colorado Correctional Medical Group PLLC (hereinafter CMGC and SWCMG will be referred to as "SWCMG").  CMGC advertises in Colorado as CMGC doing

2

business as SWCMG. CMGC exerts control over SWCMG including control over its daily operations, hiring, training, staffing, and policies and procedures. CMGC decides whether inmates including Mr. Hartwell are allowed to go to the ER for medical care.

9. At all times material hereto, Defendant Moser, M.D. was licensed to practice medicine in Colorado, specializing in Family Medicine.

10. At all times material hereto, the Defendant nurses were licensed to practice nursing in Colorado.

11. At all times material hereto, Defendants Sheriff Spurlock and Captain Duffy were employees and/or agents of Douglas County, acting within the course and scope of their employment and acting under color of state law.

12. Sheriff Spurlock and/or Captain Duffy were charged with enacting, implementing and/or enforcing jail policies and procedures, and with managing, operating, and administering the jail. Sheriff Spurlock is a final policy maker for Douglas County, who at times delegated his authority to SWCMG and/or to Douglas County employees, including but not limited to Captain Duffy.

13. At all times material hereto, Defendants Dr. Moser and the Defendant nurses were employees and/or agents of Correctional Medical Group Companies Inc., d/b/a Southwest Correctional Medical Group and/or Douglas County, acting within the course and scope of their employment and acting under color of state law.

14. At all times material, Douglas County had a non-delegable duty to provide detainees including Mr. Hartwell with necessary medical care and treatment from qualified medical providers that meets a community standard of care. To the extent Douglas County delegated authority to make decisions to SWCMG, either expressly or by default, the policies and customs of SWCMG become the policies and customs of the county, and the county is liable for

their actions if the policy proves unconstitutional. ***Ancata v. Prison Health Servs., Inc***., 769 F.2d 700, 705-06 (11th Cir. 1985).

## FACTUAL ALLEGATIONS

15.     On November 10, 2016, Kevin Hartwell was arrested at his home.  He was 55 years old.

16.     On the way to jail, Mr. Hartwell was taken to Castle Rock Adventist Hospital to have his broken hand checked.

17.     At the hospital, his current medications were listed as including prescriptions for hypertension, diabetes mellitus, seizures, and pain.  His primary care physician was copied.

18.     The previous day, on November 9, Mr. Hartwell had been to his primary care physician, Dr. Drew Werner, who listed his active problems as hypertension, diabetes mellitus, seizures, acid reflux, neuropathy, and pain.  Mr. Hartwell was taking medications for these conditions.  He had an insulin pump for his diabetes.

19.     Prior to incarceration, Mr. Hartwell took Keppra and Diazepam, administered 3-4 times per day for seizures.  Prior to incarceration, Mr. Hartwell's seizures were fully manageable.

20.     It is foreseeable that if Mr. Hartwell did not receive his anti-seizure medications, he would suffer seizures and then status epilepticus.  Status epilepticus is defined as a seizure lasting more than 5 minutes or multiple seizures occurring back-to-back without a full return of consciousness in between, and it is a medical emergency.  The longer the duration of status epilepticus before treatment, the more difficult it is to stop.  Similarly, failure to manage high blood pressure creates a risk of stroke and seizure.  Stroke itself increases ongoing seizure risks. Poorly controlled diabetes, with very low and very high blood sugars presents a substantial risk of serious harm including death.

21.     On intake at the jail on November 10, 2016, a nurse noted that Mr. Hartwell had high blood pressure and diabetes, and that the last time Mr. Hartwell had been hospitalized was for a seizure one year before.  No anti-seizure medications were provided to Mr. Hartwell.

22.     On November 11, 2016, Mr. Hartwell's blood sugar was 479, which poses a significant risk of Diabetic Keto Acidosis (DKA), a life-threatening emergency.  Dr. Moser ordered fast acting insulin by phone, but did not evaluate Mr. Hartwell or create a comprehensive plan to manage Mr. Hartwell's medical condition.

23.     On November 12, 2016, Mr. Hartwell's blood sugar went from dangerously low at 41 to dangerously high at 409, both of which pose a serious risk of death.  Dr. Moser prescribed an injection of insulin by phone, but failed to evaluate Mr. Hartwell or follow up to assure his blood sugar had been controlled.  He should have ordered an evaluation of Mr. Hartwell's vital signs, mental status, and a recheck of his blood sugar after insulin to evaluate his response, and determined how Mr. Hartwell was using his insulin pump. Based on information and belief, by this time, Dr. Moser knew that something was very wrong with Mr. Hartwell's diabetes management, but he failed to take reasonable measures to abate the substantial risk of serious harm to Mr. Hartwell.

24.     On November 13, 2016, Mr. Hartwell's blood sugar was elevated and his blood pressure was dangerously high at 180/120.  Later, his blood sugar rose to 532 and he had ketones in his urine, which is an indicator of possible DKA, a life-threatening emergency.  While in medical, Mr. Hartwell "zoned out and slumped over" and "seemed to be shaking while laying down."  Jessica Isaacs, RN documented that she was on the phone with Dr. Moser when this occurred and Dr. Moser ordered Mr. Hartwell to remain in medical for observation for 1.5 hours. Dr. Moser should have urgently transferred Mr. Hartwell to a higher level of care such as an ER based on just his blood sugar level with the presence of urinary ketones.  It was even more

5

imperative to urgently transfer when Mr. Hartwell zoned out, slumped over, and shook. Based on information and belief, Dr. Moser and the nursing staff knew that Mr. Hartwell was having seizures, which poses a substantial risk of serious harm or even death.   No anti-seizure medications were provided to Mr. Hartwell.

25.     Mr. Hartwell later that day complained of dizziness, which was not explained by blood pressure or any cause, other than seizures.  The complaint of dizziness was documented by Nurse Walter, and then ignored.

26.     On November 14, 2017, Mr. Hartwell's blood sugar was 353 and his blood pressure was dangerously high for the second day in a row at 180/120, despite medications. Again he was given an additional medication "per nursing protocol" to reduce blood pressure. Dr. Moser failed to evaluate Mr. Hartwell to manage his blood pressure and diabetes.  Dr. Moser ordered his insulin pump be disconnected without explanation or evaluation.  Again Mr. Hartwell complained of dizziness during a period when his vital signs and blood sugar level were normal.  His dizziness was ignored.   Based on information and belief, Mr. Hartwell was suffering seizures that remained untreated.

27.     On November 15, 2016, at 2:00 a.m., Mr. Hartwell's blood sugar was 39, which is dangerously low and may presage hypoglycemic seizures and coma.  He was given sugar tabs but not evaluated by a physician.  Mr. Hartwell was at substantial risk for recurrent hypoglycemia and death without a change in management of his medical condition.  At 8:00 a.m., his blood pressure was 190/110, and at 10:15 a.m., it remained dangerously high at 180/130.  Dr. Moser allegedly ordered by phone an increase in his current blood pressure medication and that another blood pressure medication be added, which was allegedly given by Nurse Vigil, but the Medication Administration Record reflects only that his previous medication at the previous dosage was given earlier in the morning.

6

28.      Later on November 15, 2016, Dr. Moser finally saw Mr. Hartwell.  During this appointment, he ordered an increase in his blood pressure medication and a new medication be added.  Dr. Moser declined to take any action to manage Mr. Hartwell's diabetes; Dr. Moser declined to evaluate Mr. Hartwell's hand fracture that was still in a splint.

29.      Mr. Hartwell's dangerously elevated blood pressures put him at significant risk for stroke, kidney injury, and heart damage, and his uncontrolled diabetes increased these risks.

30.      During Mr. Hartwell's incarceration, Dr. Moser was aware of Mr. Hartwell's uncontrolled diabetes, having been called multiple times with dangerously high blood sugars. He did not review Mr. Hartwell's blood sugar results during his evaluation on November 15, 2016, and did nothing substantive to control or monitor the wild swings in Mr. Hartwell's blood sugars, placing him at significant risk for life threatening complications of diabetes.  He ordered follow up in 3 months for a patient with uncontrolled hypertension, diabetes, and a 5 day old splinted hand fracture.  He failed to contact Mr. Hartwell's primary care physician, and no treatment was provided for his seizures.

31.      On November 16, 2016, Mr. Hartwell complained: "Not taking the meds in here that I was taking at home," and "I'm begging you to help me some more."  Nothing was done. Mr. Hartwell was not administered Keppra.  Mr. Hartwell was not administered diazepam.

32.      On November 17, 2016, Mr. Hartwell's blood sugar rose to 478, but Mr. Hartwell was not evaluated for signs and symptoms of hyperglycemia, nor was his blood sugar rechecked after treatment.

33.      On November 18, 2016, Mr. Hartwell's blood sugar was again high at 418, but Mr. Hartwell was not evaluated for signs and symptoms of hyperglycemia, nor was his blood sugar rechecked after treatment.

7

34.     On November 19, 2016, Nurse Isaacs performed an initial health assessment of Mr. Hartwell, and noted that he had a history of seizures, but failed to obtain any information about his seizures.  No medications were provided to prevent his seizures.  Nurse Isaacs noted his extremities were normal despite a hand fracture in a splint and sling.  She also noted that he had a history of diabetes, hypertension, stroke, and heart trouble, but concluded he had no significant medical issues.  Her plan: return to medical "as needed."  There is no evidence that Nurse Isaacs contacted Dr. Moser or that Dr. Moser reviewed her findings even though all positive findings in the history and physical must be reviewed by the treating clinician.

35.     Based on information and belief, Nurse Isaacs knew of the substantial risk of serious harm posed by a patient with a recent hand fracture, uncontrolled diabetes, episodes of severe hypertension, and a history of seizures because that risk is obvious for someone with her training.  It was not reasonable to recommend follow up "as needed."

36.     The National Commission on Correctional Health Care's Standards for Health Services in Jails requires that all inmates receive an initial health assessment by a qualified health care professional within fourteen days after admission.  This is supposed to be an in depth assessment to identify any health care problems needing medical management and provides a safety net for any problems that may have been missed during the intake process.  A RN can perform this assessment only when the nurse completes the appropriate training approved or provided by the responsible physician.  Based on information and belief, Nurse Isaacs did not receive the appropriate training, supervision and/or oversight, or there was an unconstitutional policy or custom that required or allowed nurses to perform inadequate assessments without contacting a physician.

37.     Mr. Hartwell's blood sugars and blood pressure remained out of control.  On November 21, 2016, his blood sugar rose to 405 in the early morning and then dropped to 64

8

before breakfast, rising again to 381 by evening. On November 24, 2016, his blood pressure was 190/104, and his afternoon blood sugar was 364. His hypertension placed him at continuing risk of complications such as a stroke or heart attack.

38.     On November 25, 2016, Mr. Hartwell's blood pressure was 189/110, and he suffered from shakiness, dizziness, and dry heaves. At 1:00 p.m., Mr. Hartwell reported he could not breathe, felt like he had a weight on his back, and felt like he was "dying." A patient with diabetes and hypertension who complains he feels like a he has a weight on his back must be evaluated for heart attack. Nurse Vigil failed to contact Dr. Moser and instead decided Mr. Hartwell was suffering from mental illness. She told him to notify Mental Health and to lay down in his pod and relax.

39.     On November 26, 2016, Mr. Hartwell again notified a nurse, "I'm dying," and complained of shortness of breath in the early morning. His blood pressure was again dangerously elevated at 192/112. Nurse Wade failed to contact a doctor, or arrange for transfer to a higher level of care if the provider could not be reached. She did not monitor Mr. Hartwell's condition, despite the obvious substantial risk of serious harm. At 4:00 p.m., Mr. Hartwell suffered focal seizures in his cell, with behavior and shaking typical for focal seizures. He was brought to medical in a wheel chair where the focal seizures and bizarre behavior continued. Nurse Vigil knew Mr. Hartwell had a history of seizures because it was documented in his medical records. Mr. Hartwell should have been transferred to a higher level of care to be evaluated for seizure, stroke, or brain lesion. Nurse Vigil (incorrectly documented initially as Nurse Davidson) failed to notify a physician. She practiced outside the scope of her license and failed to fulfill her gatekeeper role in deciding to send Mr. Hartwell back to his pod.

40.     On November 28, 2016, Mr. Hartwell's blood sugar rose to 535, the highest recorded amount at the jail. With an earlier blood sugar of 532, Mr. Hartwell had chemical

evidence suggesting DKA, which presents an obvious risk of serious harm.  Dr. Moser was contacted but failed to evaluate Mr. Hartwell despite the obvious substantial risk of serious harm.

41.     On November 29, 2016, it is documented in a late entry that at 10:00 a.m., "pt was having a seizure."  Nurse Russak arrived at Mr. Hartwell's cell in time to observe the seizure.  See video clip at https://www.youtube.com/watch?v=-9l8bz_Rtc0&feature=youtu.be She described a deputy holding Mr. Hartwell who had his arms across his chest and was "convulsing."  She noted he started d sating at 77%, and oxygen was applied.  She noted seizure like activity for another 2 minutes.  She reported bringing Mr. Hartwell to medical and contacting Dr. Moser who ordered Keppra for seizures without evaluating Mr. Hartwell. However, Nurse Russak did not administer the Keppra, and the seizure medication was never provided to Mr. Hartwell.  None of Mr. Hartwell's medications, including Keppra, were ordered from Diamond Pharmacy. All of Mr. Hartwell's medications were entered "profile only" with Diamond Pharmacy so that they would not be filled.

42.     Mr. Hartwell's condition was obviously too complex to be managed over the phone, as evidenced by the failure to control his hypertension and diabetes for over two weeks, and he was at substantial risk of intracranial hemorrhage, stroke, status epilepticus, and death. The Defendants knew Mr. Hartwell was having seizures and yet were deliberately indifferent to the substantial risk of serious harm in failing to transfer him to a higher level of care.

43.     Instead, Defendants moved him to a cell in medical to monitor him.  They then destroyed those medical records and video footage of Mr. Hartwell in the cell in the medical unit as well as video footage of the hallway outside the cell in medical showing whether anyone checked on him or provided him medical care.

44.     At some point, the Defendants moved Mr. Hartwell back to his cell in K pod and left him in his cell in status epilepticus, with seizures of the same appearance as the one in the

10

previous video clip, until 3:30 a.m. on November 30, 2016, when he was frothing at the mouth and near death.  During this period, nurses and officers watched him dying and did nothing.

45.     At 8:16 p.m. on November 29, 2016, Sophia Nix, LPN went to Mr. Hartwell's cell where he was suffering from seizures.  No seizure medication was provided.  Nurse Nix called Dr. Moser and told him Mr. Hartwell's presentation was inconsistent with seizures, as Mr. Hartwell was suffering from seizures on camera. Nurse Nix knew she is not qualified to rule out seizures.  According to Nurse Nix, Dr. Moser ordered a LPN to monitor Mr. Hartwell.  Nurse Nix left Mr. Hartwell in his cell. She ordered that he be moved from his bed to the floor because of the seizures, but no seizure medication was provided.

46.     Dr. Moser was deliberately indifferent in not ordering Mr. Hartwell be transferred urgently to a higher level of care on 11/29/16.  He knew that a nurse was not qualified to rule out seizures.  Having ordered anti-seizure medication that morning, he was well aware of the serious risk of substantial harm to Mr. Hartwell, and he knew that the seizures were continuing, but failed to take reasonable measures to abate the risk.

47.     Mr. Hartwell underwent status epilepticus without treatment, at a minimum from shortly after 8:00 p.m. on 11/29/16, until and after EMS was called around 3:30 a.m. the following day.  During that time, he remained unresponsive, tachycardic, foaming at the mouth, and in need of a breathing tube.  After more than seven hours of status epilepticus, Nurse Nix finally called EMS.  EMS arrived and Mr. Hartwell was transported to the ER at Castle Rock Adventist Hospital.   See video link of Mr. Hartwell in his cell entering and then remaining in status epilepticus for over seven hours at the following link: https://youtu.be/htxk_J6faGY

48.     In the eight hours for which there is video leading up to transport to the ER, Mr. Hartwell suffered over 200 seizures.  During that period of time he was under ordered and actual

11

supervision.  The Defendants knew he was suffering from seizures and knew of the substantial risk of serious harm but failed to take any measures to abate it.

49.     EMS was called around 3:30 a.m. on 11/30/16.  When EMS arrived, Mr. Hartwell was unresponsive.  EMS asked Defendants Douglas County and SWCMG how long Mr. Hartwell's symptoms had been presenting.  Defendants knew that subsequent treating physicians would rely upon this information.  Defendants knew that they had nearly killed Mr. Hartwell.  Defendants chose to protect themselves rather than Mr. Hartwell:  they responded to EMS' question by stating that these symptoms had started at 3:30 a.m.  EMS documented this conversation, writing into their records "History of the event was obtained from the facility staff. Staff state they found the patient in his cell seizing around 0330."

50.     At the hospital, Mr. Hartwell continued to have seizures requiring intravenous medications. Mr. Hartwell was in respiratory failure.  He was in acute kidney failure as a result of muscle damage from continuous seizures.  A MRI revealed an acute stroke deep in the right side of his brain.  He was diagnosed with status epilepticus, intractable complex partial seizures, stroke, shock, respiratory failure, and kidney failure.  Mr. Hartwell's prolonged status epilepticus caused him to suffer brain damage.

51.     On the morning of November 30th, Kevin Hartwell's wife, Barbara, was called by the hospital.  She rushed to the hospital, but Douglas County employees or agents refused to allow her to enter the hospital room where her husband lay unconscious, in a coma, and on a breathing tube for "her protection."

52.     Mrs. Hartwell was then forced to go to the Courthouse to request an emergency order allowing her to see her husband.  The emergency order was granted by the judge, over the government's objection.  Back at the hospital, the deputies saw the order and still denied her entry for another hour.  Throughout this ordeal, she did not know if her husband would live or

die.   Once allowed entrance, she was able to speak with ICU doctors.  It was Mrs. Hartwell who informed the ICU doctors that her husband had standing prescriptions for Keppra and Diazepam for seizures.  The Defendants had not provided this information to the doctors.

53.     On the morning of November 30th, ICU staff also noted in their records that tests were run to try to determine which medications the patient was on prior to entering jail, and that "we do not have records from the jail."  The Defendants' failure to provide the hospital with Mr. Hartwell's medical records violates the standards of care of recordkeeping, maintenance, and production necessary to assist doctors in the treatment of a life-threatening illness, and it constitutes deliberate indifference to his serious medical condition.  Based on information and belief, Douglas County and/or SWCMG had a policy, practice, and/or custom of routinely failing to provide inmate medical records to EMS and/or hospitals when an inmate was transferred emergently due to a serious, life-threatening medical need, or purposefully providing misinformation to conceal their deliberate indifference.

54.     A thalamic infarct was detected at the ICU through objective imaging.  Tissue Plasminogen Activator (tPA) can mitigate the long-term damage of stroke.  However, ICU staff noted that Mr. Hartwell was "Not a tpa candidate due to unclear timing of symptom onset." (emphasis supplied). Candid recordkeeping and record-production to ICU would have prevented this problem.  Candid disclosure of SWCMG's and jail staff's observations over the prior 20 days would have assisted in preventing this problem.  Turning over video surveillance footage would have given doctors additional information and aided in the treatment of Mr. Hartwell.

55.     The following day, ICU staff noted "He has a known seizure disorder and has been off his 2 AEDs since 11/10/16 (20 days PTA), This is likely the cause of his seizures." "Since then he has been in jail and it appears he has not been given the Keppra or the

Diazepam." "Patient remains acutely ill…current instability or significant risk of life threatening decompensation." (emphasis supplied).

56.     Some medical records were finally submitted by the Jail to ICU days later after Mr. Hartwell remained on critical status. At that time, ICU staff noted, "Reports from jail reviewed. The patient may have been having seizures for several days before he came to the ED. I do not see that anti-convulsants were ordered in the documents that we have from the jail."

57.     Six days after arrival at ICU, on December 5, Mr. Hartwell was extubated.

58.     Fourteen days after arrival, on December 13, Mr. Hartwell was responsive enough to be transferred to a rehabilitation facility.

59.     In early 2017, Mr. Hartwell was discharged into home-care. At present, he is afraid to do activities alone at home because he continues to suffer seizures without warning, and he struggles to walk without falling. His wife must go to work knowing that at any time she may need to take him to the ER. When she comes home at night, she never knows how she will find him.

60.     Mr. Hartwell suffered a brain injury that robbed him of his short term memory. He watches the same episodes of shows repeatedly because he can't remember that he just watched them. He can't complete the book he was writing. He can't drive or participate in activities that he and his wife used to enjoy, or that he used to do to assist his wife. Instead, he struggles to care for himself, and suffers from tremors and cognitive delays. He has required emergency care with ambulance transfers since the initial stroke and prolonged status epilepticus.

61.     The failure to determine which seizure medications Mr. Hartwell had been prescribed and provide them to him put him at an obvious substantial risk of serious harm. The denial of medical care and seizure medications caused Mr. Hartwell to enter status epilepticus, a

life threatening medical emergency.  Douglas County Jail and SWCMG knowingly maintained a pattern and practice of systemic deficiencies in the care and treatment of serious chronic conditions including Mr. Hartwell's life threatening chronic conditions, which violated Mr. Hartwell's Constitutional right to necessary medical treatment from a qualified provider for serious health needs.

62.     Mr. Hartwell also suffered a stroke while in the care of Defendants.  Failure to address and control Mr. Hartwell's diabetes and hypertension increased the risk of stroke, which is an additional risk factor for seizures.  The failure to obtain an adequate history of Mr. Hartwell's seizure disorder and the failure to appropriately respond to his seizures, as well as the failure to control Mr. Hartwell's diabetes and hypertension caused him to suffer a stroke and status epilepticus while at the jail.

63.     The combination of the stroke and denial of seizure medications caused Mr. Hartwell's status epilepticus and resulting shock, respiratory failure requiring intubation, acute kidney failure as a result of muscle damage from the continuous seizure, and continued seizures after admission to the hospital that could not be controlled despite IV medication.  As a result, he has suffered left-sided weakness, cognitive impairment, memory loss, tremors, and problems swallowing.  He continues to suffer from seizures.

64.     Based on information and belief, Mr. Hartwell began suffering from seizures in the jail on or before November 13, 2016, when his first seizure was documented by a nurse. These seizures were very probably caught on video tape footage at the jail, which includes surveillance of cells and hallways.

65.     On December 1, 2016, Douglas County pulled video footage from Mr. Hartwell's cell in K Pod that revealed approximately 200 seizures during the approximately 7 hours before he was sent to the ER, and saved the footage onto a C.D.

66.     On information, belief, and reasonable inference from the facts described herein, Defendants, including but not limited to Sheriff Spurlock, Captain Duffy, and employees of SWCMG watched the footage, and they understood the footage to be highly incriminating. Their concealment of this video, as well as destruction of other video and medical records to support a false story that Mr. Hartwell suffered one brief seizure prior to transport to the ER supports an inference that they knew that they should have transferred Mr. Hartwell to the ER after he suffered the first seizure.  By covering up SWCMG's unconstitutional policies and procedures, the final policy maker for Douglas County, Sheriff Spurlock and/or Captain Duffy, ratified them.

67.     In December, 2016, Douglas County via Captain Duffy and Sheriff Spurlock (hereinafter "Douglas County") received a letter from Metier Law Firm informing it of its duty to preserve, for the litigation process, all medical records and surveillance footage of Mr. Hartwell from November 10 through November 30, 2016.  No video footage had been destroyed at this point.

68.     In December, 2016, Douglas County received a written CORA request for all surveillance footage of Mr. Hartwell (including from the in-cell cameras), demanding that the footage *actually be turned over and produced* pursuant to the Colorado Open Records Act. On information and belief, Douglas County shared this CORA request with SWCMG, and communicated with SWCMG on which video footage to preserve and which to destroy.

69.     SWCMG had control of Mr. Hartwell's medical records.  Douglas County and/or SWCMG controlled the video footage.  They communicated between each other about Plaintiffs' requests for records and video.  They recognized the complete records and video were incriminating.  What followed was production of edited, incomplete medical records and edited, incomplete video footage.  The records and documents were edited in such a way as to give the impression that Mr. Hartwell had been transferred to ICU immediately after suffering his first

16

seizure, and that he had not undergone hours of status epilepticus.  The medical records and video produced were edited so as to give the impression that brain damage, if any, was not the result of any delay or misconduct on the part of defendants because no such delay had occurred, and status epilepticus had never been observed.  The edited medical records and edited video surveillance produced were entirely consistent with the false statements given to EMS, that Mr. Hartwell's symptoms had begun at around 3:30 a.m. on November 30th, when the jail called for emergency transfer.

70.     In December, 2016, Douglas County received a formal request for *all* of Mr. Hartwell's jail medical records.  On information and belief, Douglas County shared this request with SWCMG and communicated with SWCMG on which medical records to provide.

71.     On December 20, 2016, Douglas County/SWCMG turned over some medical records.  Douglas County represented that these records were the complete and accurate medical records for Mr. Hartwell.  In reality, they were misleading and incomplete, and indicated Mr. Hartwell had suffered only one brief seizure before being hospitalized.  Douglas County/SWCMG withheld, without comment, the in-cell surveillance footage from December 29-30, depicting Mr. Hartwell having more than 200 seizures while guards and medical staff occasionally entered the cell to watch ("The 200-Seizure Video").

72.     Prior to destroying any surveillance footage of Mr. Hartwell, Defendant Douglas County and SWCMG were put on notice that Mr. Hartwell's ongoing health depended on fully informed treatment by his physicians, and that his physicians would benefit from all surveillance of Mr. Hartwell while in jail.  Douglas County and SWCMG had a duty to give this potentially life-saving information to treating physicians.  Douglas County moreover made affirmative statements to Plaintiffs, through their attorney, that the surveillance footage was in fact being preserved and collected.  Instead, Sheriff Spurlock as the final policy maker for Douglas County

17

Jail and/or those to whom he delegated authority including Captain Duffy authorized and/or ratified the concealment and later destruction of the vast majority of surveillance footage of Mr. Hartwell's symptoms and treatment as well as medical records while Mr. Hartwell was in medical observation, which obstructed the ongoing diagnosis and treatment of Mr. Hartwell, as well as efforts of his legal counsel.

73.     In January, 2017, Douglas County/SWCMG received a letter from Metier Law Firm, formally requesting a privilege log accounting for all surveillance footage falling within the scope of the CORA request, which Douglas County was declining to produce (so that the Court could review the validity of the privilege claim, if necessary).

74.     In January, 2017, Douglas County/SWCMG decided not to list The 200-Seizure Video in a privilege log as well as other video and medical records, and never told Plaintiffs about it.

75.     On February 7, Douglas County/SWCMG produced additional medical records. The records suggested Mr. Hartwell had suffered only one brief seizure before being hospitalized.  Douglas County and SWCMG represented these records as complete.  Douglas County/SWCMG withheld, without comment, the "200 seizure video" as well as other video and medical records of Mr. Hartwell.

76.     On February 15, Metier Law Firm wrote back to Douglas County, stating, "I just wanted to follow up to confirm that we have the complete medical records, since I have still not heard anything to the contrary."

77.     On February 16, Douglas County and SWCMG produced its third batch of medical records. The records indicate Mr. Hartwell had suffered only one brief seizure before being hospitalized.  Douglas County and SWCMG represented these records as complete.

Douglas County/SWCMG withheld, without comment, the "200 seizure video" as well as other video and medical records of Mr. Hartwell.

78.     On February 22nd, Douglas County received the following from Metier Law Firm:

> I wanted to follow up on Mr. Hartwell's written [CORA] request that he be provided with the surveillance footage of himself while in Douglas County Jail. I know this footage has been preserved due to our previous [spoliation] letter. I have not received a rejection or privilege log, and so assume that you are still working on getting us a copy of the footage of Mr. Hartwell, such as him moving from his cell to medical, the footage of him within his cell while being evaluated by medical or while suffering seizures, and footage of him while in medical monitoring.
> Mr. Hartwell's medical team is continuing to run diagnostics, investigate, and treat Mr. Hartwell's brain damage and multiple interacting conditions. They wish to prevent any recurrences, and the best way to do this is to understand the cause of the initial episode and stroke. They will be assisted by additional information, including Mr. Hartwell's presentation, characteristics, and potentially changing ambulation patterns, between November 10 and 30. This is also important given that medical providers are still unable to ascertain how, when, and why Mr. Hartwell's stroke occurred while in jail, and this too would assist them in understanding the cause and preventing any recurrence of stroke, which has the potential to kill Mr. Hartwell a second time around.
> While the Courts give Mr. Hartwell the right to recover this footage in "Discovery," I would strongly prefer to avoid the delay and cost of needless litigation, and so continue to rely instead on the open records act. Mr. Hart[well][sic] and his medical team just want to know, and understand, what happened to him between November 10 and November 30, 2016.

79.     Between February 22nd and March 7th, Douglas County/SWCMG reviewed additional surveillance spanning November 10, 2016 through November 28, 2016.  During this time, the footage of Mr. Hartwell in his cell was still available, capable of being watched, and capable of being preserved.  The 200-Seizure Video, already burned onto a CD, sat collecting dust.  Douglas County representatives searched for and found small clips of Mr. Hartwell walking the hallways of Douglas County Jail, appearing fine, and these clips were burned onto a C.D.  The footage from Mr. Hartwell's cells including the cell in medical where he was "monitored" after being diagnosed with seizures the morning of November 29, 2016, was deliberately deleted.

80.     On March 10, Douglas County responded that it had collected all the video responsive to Mr. Hartwell's CORA request.  Mr. Hartwell paid for his CORA request, and Douglas County mailed Metier Law Firm a disc containing 25 highly edited video clips, none depicting any seizures.  Douglas County/SWCMG held back the 200-Seizure Video, the video of the medical monitoring cell, as well as video from Mr. Hartwell's cells in K and F Pods where he was housed, which have video cameras inside the cells and outside the cells.  They withheld medical records during the period Mr. Hartwell was in a medical monitoring cell.  Douglas County declined to list cell video in its privilege log, and in doing so represented it did not exist.

81.     On March 23, Douglas County received the following from Metier Law Firm:

> *Today I received the complete video surveillance file for Mr. Hartwell. I noticed that there were no videos depicting Mr. Hartwell's medical treatment as observed and recorded in the medical records (including conditions observed at k-pod, at "medical," and at the walk inbetween medical and k-pod. I simply want to confirm that I am correct in understanding that there are no video capturing devices capable of capturing what goes on at "Medical," in the K-Pod area, nor on the walk between KPod and Medical.*
> *Thank you for your attention in this matter.*

82.     Douglas County did not respond to the March 23, 2017 inquiry.

83.     In or around March, 2017, the remaining 18 days of surveillance footage of Mr. Hartwell in his cell and in a medical monitoring, including potential seizure events, were permanently deleted on account of Douglas County and SWCMG's deliberate decision not to flag the footage for preservation.

84.     On March 31, 2017, Metier Law Firm followed up.  Douglas County did not respond to the March 31, 2017 inquiry.  Douglas County silently sat on the 200-Seizure Video.

85.     On April 11, 2017, Metier Law Firm followed up.  Douglas County did not respond to the April 11, 2017 inquiry.  Douglas County silently sat on the 200-Seizure Video.

86.     On April 13, 2017, Metier Law Firm followed up.  Douglas County did not

respond to the April 13, 2017 inquiry.  Douglas County silently sat on the 200-Seizure Video.

87.     On April 18, 2017, Douglas County received the following by e-mail:

*For the past three weeks, I have given Douglas County the benefit of the doubt, presuming that it complied with our CORA request by submitting all footage of Mr. Hartwell. Notably, Douglas County Jail has always been aware of its obligation to produce a privilege log for anything it was declining to produce, identifying the document being withheld and the privilege being asserted. Privilege logs ensure that government actors cannot conceal documents by claiming a frivolous privilege, because privilege logs allow a Court to review the privilege being claimed.*
*The outright refusal to simply say "yes, we have provided all footage of Mr. Hartwell," despite ongoing requests over the past three weeks, is beginning to feel like an implicit admission that Douglas County Jail has not provided all the footage of Mr. Hartwell.*
*I would like to work cooperatively with Douglas County Jail. But I cannot work cooperatively with someone who is intentionally evasive and ignoring simple questions essential to resolving this CORA request. The silent treatment stifles trust.*
*Going forward, I am going to presume that:*
*1) Douglas County Jail has withheld portions of video surveillance footage of Mr. Hartwell;*
*2) For which it has no legal basis to withhold;*
*3) For which it declined to identify any legal privilege for in a privilege log;*
*4) Which it does not want to produce;*
*5) Which it does not want to acknowledge exists;*
*6) But which it also does not want to lie about not existing;*
*7) And so is intentionally remaining silent on the topic.*
*If I am wrong in any of these assumptions, please, correct me. I do not care what the answer is; I just need an answer.*

88.     Douglas County did not respond.

89.     On April 26, 2017, Douglas County received formal notice that Metier Law Firm

was seeking Court intervention under the Colorado Open Records Act, to determine at a hearing

whether or not all footage had indeed been provided, and if not, why not.  For the first time,

Douglas County's decision, to ignore the 200-Seizure Video and pretend it did not exist, created

*more* risk of getting in trouble, rather than minimizing it, because Douglas County was about to

be forced to take a position in writing before the Court, and either perjure itself or admit to the missing surveillance and existence of in-cell cameras.

90.     Within hours of the April 26, 2017 e-mail, Douglas County responded, with its first e-mail in months.  Douglas County conceded that there was "some" additional footage. Douglas County/SWCMG later produced the 200-Seizure Video, which contradicted its own medical records.  The video and medical records from the medical monitoring cell have never been produced, nor other video of Mr. Hartwell in medical or in his cells in K and F Pods.

91.     Similarly, when Mr. Hartwell went to the ICU, Douglas County and SWCMG conspired to give ICU physicians misleading oral reports and misleading medical records, all of which stated that Mr. Hartwell had *never* undergone *status epilepticus* (prolonged seizure symptoms) while in the jail, despite Defendants' knowledge that such representations were untrue.  Douglas County and SWCMG conspired to do so with knowledge that treating physicians would be more likely to misdiagnose the origin of Mr. Hartwell's brain-damage (for example, as being pre-existing, alcohol related, or stroke-related, rather than due to prolonged *status epilepticus*.

92.     While responding to Plaintiffs' pre-litigation requests for records and medical information, Douglas County and SWCMG were in communication, including coordinated discussions of Metier Law Firm's records requests, production of records, and production of information about what had occurred to Mr. Hartwell while in jail in order to make the medical records produced match the short video clips produced to support a false story that Mr. Hartwell suffered one brief seizure before EMS was called.  The cover up did cause confusion by Mr. Hartwell's physicians, who recorded some of the false information being fed to them in Mr. Hartwell's medical records, and by Mr. Hartwell's attorneys trying to figure out what happened to Mr. Hartwell.

93.     At all times, Defendants were aware that a successful lawsuit can mean financial consequences, as well as public relations and reputational consequences.

94.     One may reasonably infer and conclude that Defendants and Defendants' agents communicated with each other about Mr. Hartwell's medical records and video, and that they conspired to create the appearance that Mr. Hartwell suffered only one brief seizure before 911 was called, knowing that this would enhance the chances that:

- An attorney would turn away Mr. Hartwell and his case as being too risky and lacking in evidence to prosecute, and the case would go away;

- Metier Law Firm would drop his case, due to lack of evidence of wrongdoing, and the case would go away;

- The case, even if brought all the way through years of litigation and to trial, would lose due to lack of proof of Defendants' misconduct, and the case would go away.

- Mr. Hartwell's physicians would fail to pull him from his *status epilepticus*, and that he would drop into a coma, become too brain-dead to effectively testify, and/or he would die, and the case would go away.

95.     When attempting to find footage of Mr. Hartwell spanning 20 days, going to the camera in his cells as well as in the medical monitoring cell is the easiest way to find that footage (as compared to watching hours of video to try to find him walking the halls or common areas).

96.     When attempting to find footage which might be important or highly relevant to this dispute, the most common-sense place to go would be the footage of the events alleged by medical staff to have occurred in the medical records (Mr. Hartwell's cell in medical), of which SWCMG had knowledge.

97.     Douglas County/SWCMG spent tremendous effort creating a highly edited montage of 25 video clips, all outside Mr. Hartwell's cell, and all of Mr. Hartwell appearing fine, while simultaneously holding back (and omitting from a privilege log), and then destroying footage of seizures inside Mr. Hartwell's cells.

98.     When compared to the video that was produced, the medical entries from November 29 & 30 are self-serving and misleading.  Medical records of Mr. Hartwell during the time he was in the medical monitoring cell on November 29, 2016 were destroyed as well as the video from inside and outside that cell.  Deletion of the prior 300 hours of footage renders Mr. Hartwell unable to assess the reliability or incompleteness of the previous weeks of medical records, and the brain damage from the seizures has left him without his own memory of events.

99.     Douglas County's jail maintains accreditation with the American Correctional Association (ACA) and National Commission on Correctional Health Care (NCCHC). Defendants derive benefit from Douglas County maintaining its accreditation with ACA and NCCHC.  Accreditation requires self-reporting of serious medical incidents and emergency room transfers, and accreditation is based upon statistics of safety.  Defendants conspired, and had a policy and practice of keeping medical incidents, such as the one which happened to Mr. Hartwell, a secret from their accrediting agencies in order to improperly maintain their accreditation.

100.    As a result of his injuries, Mr. Hartwell was damaged in the following particulars:

(a)     Non-economic damages consisting of past and future physical pain, suffering, anxiety, emotional distress, stress, fear, and loss of enjoyment of life;

(b)     Past and future medical, rehabilitation and other health care expenses for his physical injuries;

(c)     Home services expenses;

24

(c)     Permanent injuries including but not limited to brain damage and ongoing

seizures;

(d)     Permanent impairment.

## FIRST CLAIM FOR RELIEF

**(42 U.S.C. § 1983 claim under the 8th and 14th Amendments to the US Constitution against Defendants Moser, Nix, Wade, Russak, Isaacs, and Vigil)**

101.    Plaintiffs incorporate herein all previous allegations and statements.

102.    At all times material, Defendants Moser, Nix, Wade, Russok, Isaacs, and Vigil had a legal duty to provide medical care to inmates within the standard of care for the community.  The Defendants violated that duty by knowingly and purposefully denying Mr. Hartwell medical care and treatment by qualified medical providers for his serious medical condition, including his seizures, hypertension, and diabetes.

103.    The failure to determine which medications an inmate with a history of seizures has been prescribed and should be administered presents an obvious risk of serious harm.  Nurse Barron documented on intake that Mr. Hartwell was hospitalized for seizures in the previous year. Mr. Hartwell's PCP is documented and yet none of Defendants or their agents contacted him, and Mr. Hartwell was never provided seizure medications.

104.    Beginning on November 11, 2016, Dr. Moser knew that Mr. Hartwell's extremely high blood sugar level posed a significant risk of DKA, a life-threatening emergency, but failed to take reasonable measures to abate the risk, including a careful evaluation and development of a comprehensive plan to manage Mr. Hartwell's medical condition.  Had he done so, it is more likely than not he would have communicated with Mr. Hartwell's PCP, determined which medications to order, and treated his seizure disorder.

25

105.    On November 12, 2016, Dr. Moser was informed by nurses that Mr. Hartwell's blood sugar was fluctuating between dangerously low and dangerously high blood sugar, which poses a substantial risk of serious harm including death if not controlled, and he knew that something was very wrong with Mr. Hartwell's diabetes management, but he failed to take reasonable measures to abate the risk including an evaluation and development of a comprehensive plan.

106.    On November 13, 2016, Dr. Moser knew Mr. Hartwell's blood pressure was dangerously high at 180/120, and that his blood sugar was 532 with ketones in his urine, which is an indicator of possible DKA, a life-threatening emergency, because the nurse called him.  He knew that while he was on the phone with the nurse, Mr. Hartwell slumped over, zoned out and shook, consistent with a seizure.  The substantial risk of serious harm to Mr. Hartwell would be obvious to a doctor, and yet Dr. Moser failed to take any measures to abate the risk. He should have ordered Mr. Hartwell to be urgently transferred to a higher level of care such as an ER.

107.    Mr. Hartwell's dangerously elevated blood pressures of 180/120 on November 13 and 14 put him at significant risk for stroke, kidney injury, and heart damage.  His uncontrolled diabetes increased these risks, which would be obvious to any physician.  Dr. Moser was aware of Mr. Hartwell's dangerously high blood pressures and uncontrolled diabetes, having been called multiple times between November 11 and November 15, 2016, but failed to take reasonable measures to abate the risk such as a complete evaluation and/or referral to the ER.

108.    On November 15, 2016, Dr. Moser finally saw Mr. Harwell, but his examination was woefully inadequate.  He did not review Mr. Hartwell's blood sugar results, and did nothing substantive to control or monitor the wild swings in Mr. Hartwell's blood sugars, placing him at significant risk for life threatening complications of diabetes.  Dr. Moser failed to examine Mr. Hartwell's hand fracture, and did not order follow up for his hypertension, or a comprehensive

plan for his diabetes, hypertension, and seizures.  He failed to order seizure medications.  Dr. Moser did not take reasonable measures to abate the known, substantial risk of harm to Mr. Hartwell, which would be obvious to any physician with Dr. Moser's training and experience.

109.    The nurses failed to fulfill their gatekeeper roles by failing to contact Dr. Moser or send Mr. Hartwell to the ER.  For example, on 11/26/16, Mr. Hartwell notified Nurse Wade that he felt he was dying, and complained of shortness of breath, with blood pressure of 192/112, but she failed to contact a physician or arrange for transfer of Mr. Hartwell to the ER.

110.    Nurse Isaacs performed the initial health assessment of Mr. Hartwell on 11/19/16, and she failed to contact Dr. Moser to review her findings even though she knew that all positive findings must be reviewed by the treating clinician.  Nurse Isaacs knew that Mr. Hartwell had a history of seizures because he reported them to her and she documented them, but she failed to follow up and obtain information on the type of seizures and medications to treat them.  With her education and training, she knew that untreated seizures can be life-threatening, and yet she failed to fulfill her gatekeeper role, and contact Dr. Moser to review her findings and make appropriate orders.

111.    From 11/20-24/16, Mr. Hartwell's blood sugars and blood pressure were out of control.  His blood pressure was dangerously high and his blood sugars dropped dangerously low then rose dangerously high.  His hypertension placed him at continuing risk of complications such as a stroke or heart attack, and Dr. Moser failed to take any reasonable measures to abate the risk.

112.    On 11/25/16, Mr. Hartwell, with a history of seizures, diabetes and hypertension, had a blood pressure of 189/110, shakiness, dry heaves, and later felt like he had a weight on his back, could not breathe, and was dying.  These are signs and symptoms that Mr. Hartwell was at risk of a heart attack, and are so obvious that a lay person would know of the risk.  Nurse Vigil failed to take reasonable measures to abate the risk by contacting Dr. Moser.  She failed to fulfill

27

her gatekeeper role and practiced outside the scope of her license by telling Mr. Hartwell to notify Mental Health and lay down in his pod.

113.     On 11/26/16, Mr. Hartwell notified Nurse Wade that he felt he was dying, and complained of shortness of breath, with blood pressure of 192/112.  This poses an obvious substantial risk of heart attack or stroke.  Nurse Wade failed to fulfill her gatekeeper role by contacting a provider or arranging for transfer to a higher level of care.

114.     At 4:00 p.m. that day, Mr. Hartwell suffered a focal seizure, with behavior typical for a focal seizure.  Nurse Vigil knew from Mr. Hartwell's medical records that he had a history of seizures, and that he had been dangerously hypertensive with blood sugars out of control.  It would be obvious to any trained medical professional that seizure behavior coupled with Mr. Hartwell's medical history posed a substantial risk of serious injury including seizures, stroke, and death. Nurse Vigil failed to fulfill her gatekeeper role, and instead sent Mr. Hartwell back to his pod without notifying a physician.   The nurses failed to do blood pressure checks for two days after that despite an obvious substantial risk of serious harm.

115.     On November 28, 2016, Mr. Hartwell's blood sugar rose to its highest level at 535. Dr. Moser was contacted and still failed to evaluate Mr. Hartwell or transfer him to the ER.

116.     On 11/29/16, Nurse Russak observed and documented Mr. Hartwell's seizures.  She allegedly contacted Dr. Moser and received an order for seizure medication, but recorded the order in a late entry.  The seizure medication was never provided to Mr. Hartwell.  Dr. Moser and/or Nurse Russak should have ordered urgent transport to a higher level of care.  Mr. Hartwell was at risk for intracranial hemorrhage and stroke, as well as death from untreated seizures, which would have been obvious to any medical professional.  Apparently, Mr. Hartwell was moved to a medical observation cell with a video camera in the cell and outside in the hallway, but those medical records and video footage were purposefully destroyed after the County received a non-spoliation

letter and CORA requests. Around 8:00 p.m. Mr. Hartwell was sent back to his cell in K pod where he entered status epilepticus for over seven hours.  Dr. Moser and Nurse Russak and/or other nurses were deliberately indifferent to a substantial risk of serious harm by sending Mr. Hartwell to his cell in K pod to continue to suffer untreated seizures that progressed to status epilepticus.

117.    That night, Sophia Nix, LPN went to Mr. Hartwell's cell when he was suffering from seizures.  She moved him from his bed to the floor because of the seizures, but did not provide any seizure medication. She called Dr. Moser and told him Mr. Hartwell's presentation was inconsistent with seizures even though she knew she was not qualified to diagnose seizures.  Dr. Moser knew that a nurse is not qualified to diagnose seizures, and he knew that Mr. Hartwell was likely suffering from seizures because he ostensibly ordered seizure medication earlier that day and seizures are documented in Mr. Hartwell's medical records.  Yet he failed to evaluate Mr. Hartwell or order transfer to the ER.  Dr. Moser and Nurse Nix left Mr. Hartwell in his cell, to suffer from status epilepticus until 3:30 a.m. the next day, when he was finally sent to the ER.

118.    Douglas County and/or SCMG employees and/or its agents failed to inform the ER that Mr. Hartwell suffered from a seizure disorder but had been denied seizure medication, which created an additional substantial risk of serious harm to Mr. Hartwell who could not receive the immediate treatment he needed without the information.  The Defendants were deliberately indifferent in failing to provide Mr. Hartwell's medical records to doctors at the hospital for days.

119.    Each Defendant's conduct was a direct cause of Plaintiff's injuries and damages, which are indivisible, resulting in joint and several liability.  *Northington v. Marin*, 102 F.3d 1564, 1569 (10th Cir. 1996).

120.    The Defendants' unconstitutional conduct caused Plaintiff's injuries and damages as set forth in Paragraph 100, *Supra* in an amount to be proved at the time of trial.

## SECOND CLAIM FOR RELIEF

**(42 U.S.C. § 1983 Municipal Liability claim against Douglas County and SWCMG)**

121.    Plaintiffs incorporate herein all previous allegations and statements.

122.    SWCMG and/or Douglas County ("Defendants") ordered, ratified, or knowingly acquiesced in having nurses, including but not limited to Isaacs, perform constitutionally deficient initial health assessments of inmates, including but not limited to an assessment of Mr. Hartwell that, *inter alia*, failed to determine which seizure medications Mr. Hartwell was supposed to be taking for his noted seizure disorder, which poses an obvious substantial risk of serious harm or death, and noted he had no significant medical issues despite uncontrolled diabetes, hypertension, and seizures, all of which pose a substantial risk of serious harm or death.  She then failed to contact a physician as required.  Either Nurse Isaacs did not receive the appropriate training, supervision, and/or oversight, or there was an unconstitutional policy or custom requiring and/or knowingly acquiescing in allowing nurses to conduct constitutionally-inadequate intake examinations that lead to the denial of necessary medical treatment for serious medical needs, and that pose an obvious substantial risk of serious harm. In addition, Defendants had a policy or custom of routinely denying detainees, including Mr. Hartwell with access to medical treatment by a qualified medical provider, having nurses practice outside the scope of their licenses by failing to fulfill their gatekeeper roles, and denying detainees necessary and life-saving medications as described *Supra*.  There is evidence that nurses routinely failed to order medications from the pharmacy (entering orders as "profile only"); documented orders or treatment that did not occur; and failed to correctly document patient signs and symptoms, which was covered up by Douglas County and SWCMG by destroying records and video.  There is evidence that medical records and video footage was purposefully destroyed to cover up the systemic failure to provide medical care to Mr. Hartwell for serious medical needs that were known.  There are systemic and

widespread deficiencies by multiple providers in the medical care and treatment by SWCMG at the Douglas County Jail, which reflect an official policy or custom of deliberate indifference to serious medical needs, and which was the moving force behind Kevin Hartwell's injuries. The need for training, supervision, and adequate staffing of the medical department to avoid the risk of serious injury and death from life threatening illness, including but not limited to seizures, diabetes, and severe hypertension was obvious. Based on information and belief, SWCMG and/or Douglas County purposefully failed to adequately staff and/or train and/or supervise staff to provide detainees including Mr. Hartwell with access to medical treatment by a qualified medical provider for serious medical needs that posed a substantial risk of serious harm, all of which was the moving force in causing Mr. Hartwell's injuries and damages. *Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978); *Dubbs v. Head Start, Inc*., 336 F.3d 1194, 1216 (10th Cir. 2003).

123.    Additionally, CMGC requires that SWCMG use its management program to "reduce unnecessary off-site care" by ensuring the Chief Medical Officer for CMGC "reviews all off-site medical transports to enhance care and reduces unnecessary off-site medical transports." CGMC has many facilities in many states that all have to contact the CGMC Chief Medical Officer prior to transport, no matter how emergent the need for transport. Douglas County knew and approved of the unconstitutional policy requiring use of a CMGC "management program" that requires nurses to practice outside the scope of their licenses and fail to fulfill their gatekeeper roles in a timely manner. Douglas County knew SWCMG would operate under this model when it signed a contract with SWCMG, and it was deliberately indifferent to the obvious risk of serious harm to its inmates, including Kevin Hartwell.

124.    Douglas County and/or SWCMG had an unconstitutional policy and/or custom of withholding vital medical information and records from the ER when an inmate is transferred with a life-threatening medical condition as was the case with Mr. Hartwell.

125.    Douglas County purposefully failed to enforce safety provisions in its contract with SWCMG, a private, for-profit company, knowing that this failure was substantially certain to result in the violation of inmates' constitutional rights including those of Mr. Hartwell.  Based on information and belief, the contract requires, "a daily report for the previous twenty-four (24) hours will be submitted [by the Contractor to the Jail Administrator] that includes, but is not limited to, the following data (whiteboard tracking):

- Transfers to hospital emergency departments
- Communicable disease reporting
- Report of status of inmates in local hospitals
- Copies of completed medical incident reports

126.    Douglas County has never collected these daily reports, nor forwarded them to the American Correctional Association.  It never intended to implement this safety policy to hold SWCMG accountable and protect detainees, including Mr. Hartwell.

127.    Additional policies, which Douglas County and SWCMG purposefully failed to implement or enforce, knowing that this failure was substantially certain to result in the violation of inmates' constitutional rights including those of Mr. Hartwell include:

a.    A program for meeting the special needs of chronic care inmates shall be provided.  Mr. Hartwell is a chronic care inmate, but the program was purposefully not provided to him, and based on information and belief, does not exist for any inmate.

b.    The care provided shall entail the development of an individual treatment plan by the responsible physician specifying instructions on diet, medication, and diagnostic testing. Mr. Hartwell was not provided an individual treatment plan, and based on information and belief, no inmate was provided an individual treatment plan.

c.    The Contractor is responsible for the dispensing of medications and shall document the receipt, ingestion, or refusal of medications on a form approved by the Medical Director.

32

    d.   When an inmate's medication is not administered, the reason shall be likewise documented.

    e.   Physician and or physician extender services must be sufficient to provide the required needs of the day and assure medical evaluation/follow up within a reasonable time of post nursing triage referral (including weekends and holidays).

    f.   In addition, twenty-four (24) hour physician on-call services with the availability for consultation and the ability to meet the on-site needs are required. This shall include after hour and weekend needs for ordering and dispensing … necessary medications.

128.    Douglas County knew that SWCMG was not fulfilling the above written policies, and implicitly or explicitly approved despite the obvious risk of serious injury to inmates including Kevin Hartwell.

129.    At all times material, Douglas County maintained a policy that it would not reimburse SWCMG for ER transfers, or prescribed medications.

"The County recognizes that off-site services, including but not limited to hospitalization…ambulance, etc., will occasionally be necessary…**Contractor will be required to pay for off-site care…**" (emphasis supplied)

"**The Contractor shall [also] be responsible for the cost of all medications administered**."  (emphasis supplied).

130.    These policies systematically discouraged ER transfers and consistent medication administration, and this was foreseeable to Douglas County.  Douglas County purposefully ignored the obvious risk that SWCMG would avoid costs to itself and shareholders – including costs associated with prophylactic administration of medications or emergency transfers – and would instead be incentivized to gamble with citizens' lives, by internalizing the *profit* associated with non-care, while externalizing the risks, i.e. pushing the costs onto hospitals, insurance, Medicaid, and families, who are obligated

to shoulder the burden when a person requires emergency care or suffers permanent life-long injuries as a result of the Defendants' deliberate indifference.

131.    An investigative Grand Jury was convened in California to complete a thorough investigation of these same policies, as implemented between a California jail and SCMG's California Counterpart CFMG (same company prior to CMGC expanding to Colorado).  On June 8, 2016, the Grand Jury concluded that a contract requiring CFMG to pay all hospital emergency medical costs up to $15,000 per inmate for each medical/surgical inpatient episode was a disincentive to admit inmates to a hospital for necessary medical treatment, and removing the clause would foreseeably save lives.  The Grand Jury's report was widely publicized.

132.    The Defendants maintained, enforced, tolerated, ratified, permitted, acquiesced in, and/or applied an unconstitutional policy or custom of denying detainees, including Mr. Hartwell access to medical care and treatment by a qualified medical provider for serious medical needs. The deficiencies were so widespread and ubiquitous as to affect all inmates with serious medical needs at the Douglas County Jail.

133.    Access to medical care for serious medical needs constitutes a usual and recurring situation with which officers and medical staff must deal, and for which it is necessary they receive training, supervision, and oversight. The need for more or different training, discipline, and supervision was so obvious, and the inadequacy so likely to result in a violation of constitutional rights, that the policy makers of Douglas County and SWCMG, can reasonably be said to have been deliberately indifferent to the need.

134.    The inadequate training, inadequate discipline and inadequate supervision, demonstrates a deliberate indifference on the part of the Defendants towards detainees and prisoners.

34

135.     The Defendants had a policy, custom, and practice of allowing or requiring nurses and/or medical providers to purposefully and deliberately deny detainees including Mr. Hartwell medications and access to a qualified medical provider for necessary medical care and treatment for serious medical conditions, thereby creating an atmosphere where such behavior was accepted, approved and ratified, in reckless disregard and deliberate indifference to the health and welfare of persons taken into custody, including Mr. Hartwell.

136.     Douglas County had a non-delegable duty to provide detainees including Mr. Hartwell with necessary medical care and treatment from qualified medical providers that meets a community standard of care. To the extent Douglas County delegated authority to make decisions to SWCMG, either expressly or by default, the policies and customs of SWCMG become the policies and customs of the county, and the county is liable for their actions if the policy proves unconstitutional. *Ancata v. Prison Health Servs., Inc*., 769 F.2d 700, 705-06 (11th Cir. 1985).

137.     There was a direct causal link between the constitutional deprivations as aforesaid, and the inadequate training, inadequate discipline and inadequate supervision, and/or unconstitutional policies or customs of the Defendants.

138.     Each Defendant's conduct was a direct cause of Plaintiff's injuries and damages, which are indivisible, resulting in joint and several liability.  *Northington v. Marin*, 102 F.3d at 1569.

139.     The Defendants' unconstitutional conduct caused Plaintiff's injuries and damages as set forth in Paragraph 100, *Supra* in an amount to be proved at the time of trial.

## THIRD CLAIM FOR RELIEF

### (Ratification Pursuant to 42 U.S.C. § 1983 – Douglas County, Sheriff Spurlock, Captain Duffy)

140.     All of the above allegations are incorporated herein by reference.

141.     Sheriff Spurlock and Captain Duffy were policymakers and final decisionmakers for Douglas County with regards to the Douglas County Jail.  In that capacity, Sheriff Spurlock and Captain Duffy responded to Colorado Open Records Act requests for medical records and video pertaining to Kevin Hartwell, and they conducted and approved an investigation into Kevin Hartwell's injuries that was so inadequate as to constitute a ratification of the denial of constitutionally adequate medical care to Mr. Hartwell during November of 2016.

142.     In the course of the investigation propagated and approved by Defendants Spurlock and Duffy, critical medical records and critical video footage were purposefully deleted and destroyed, despite requests they be preserved.  Defendants Spurlock and Duffy knew that this footage and these records would be relevant to potential litigation, yet either knowingly and purposefully failed to order their preservation or ordered their destruction.  At a minimum, the medical records from November 29, 2016, while Kevin Hartwell was in a medical observation cell for approximately ten hours were destroyed, as well as all video during that time, and all video of Kevin Hartwell in his cells in K and F pods prior to 10:00 a.m. on November 29, 2016.

143.     The investigation propagated and approved by Defendants Spurlock and Duffy was not designed to discover what actually happened, but rather was designed to avoid identification of misconduct by any officer, supervisor, nurse or physician.  Defendants Spurlock and Duffy ignored evidence of widespread disregard of policies and procedures intended for the protection of inmates including Kevin Hartwell, and systemic deficiencies that violated Mr. Hartwell's constitutional rights.  Based on information and belief, not one officer, supervisor, nurse or

physician was disciplined, considered for discipline, or even retrained on policies intended for the protection of inmates.  Instead, Defendants Spurlock and Duffy took actions to cover up the constitutional violations by SWCMG employees and contractors, and therefor ratified those actions.

144.    Through these acts and omissions of ratification, Defendants Spurlock and Duffy were deliberately indifferent to Kevin Hartwell's constitutional rights as set forth herein. A plaintiff can establish a municipal liability claim by showing that a final municipal policymaker approved an investigation that was "so inadequate as to constitute a ratification" of the misconduct. *Wright v. City of Canton*, 138 F. Supp.2d 955, 966 (N.D. Ohio 2001).  "If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988). An isolated decision by a municipal official that is not intended to control future decisions can nonetheless give rise to municipal liability. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-81 (1986).

145.    The ratification caused Plaintiff injuries and damages in whole or in part as set forth in Paragraph 100, *Supra*.

## FOURTH CLAIM FOR RELIEF

**(Exemplary damages pursuant to 42 U.S.C. § 1983 Against All Defendants in their Individual Capacities)**

146.    All of the above allegations are incorporated herein by reference.

147.    The actions or omissions of Defendants, as aforesaid, were motivated by evil motive or intent, and/or involved a reckless or callous indifference to the federally protected rights of Mr. Hartwell.

148.    Mr. Hartwell is entitled to exemplary damages pursuant to 42 U.S.C. § 1983 in an amount to be proved at the time of trial.

### FIFTH CLAIM FOR RELIEF

**(Attorney's fees pursuant to 42 U.S.C. § 1988 against all Defendants)**

149.    All of the above allegations are incorporated herein by reference.

150.    Mr. Hartwell is entitled to reasonable attorney's fees as part of the costs, and expert fees in this proceeding to enforce 42 U.S.C. §1983 and §1988)

### SIXTH CLAIM FOR RELIEF

**(Premises Liability Act – Douglas County and SWCMG)**

151.    All of the above allegations are incorporated herein by reference.

152.    Mr. Hartwell was an invitee of the jail, and both Douglas County and SWCMG were at all times material landowners as contemplated by C.R.S. § 13-21-115 and its subparts. Mr. Hartwell, as a member of a class of persons for whom the jail was specifically designed and intended as a place of housing, "was a member of a specific branch of the public for whom the property was required to be maintained." *Carson v. Corr. Corp. of Am.*, No. 10-CV-01329-REB-BNB, 2011 WL 1656509, at *3 (D. Colo. May 3, 2011).  The *Carson* Court held that a prisoner was an invitee under the Colorado Premises Liability Act. Other jurisdictions have similarly held that prisoners are invitees.  *See Wilkerson v. United States,* 2010 WL 1462542 at *5 (M.D. Pa. April 9, 2010) (citing *Graf v. County of Northampton,* 654 A.2d 131, 133–34 (Pa.Commw.Ct.1995)) (construing Pennsylvania law); *Schwensow v. United States,* 2010 WL 1064062 at *2 (E.D.Mich. Feb. 16, 2010) (construing Michigan law) (mag. judge op.), *adopted,* 2010 WL 1064006 (E.D.Mich. March 22, 2010).

153.    Douglas County and SWCMG had a duty to prevent Mr. Hartwell from suffering injuries as a result of dangers of which it knew or with the exercise of reasonable care should

have known. Douglas County and SWCMG knew or should have known that denying an inmate with a seizure disorder medications and access to medical care by a qualified medical provider would cause seizures and status epilepticus, a medical emergency that causes brain injury and death, and yet purposefully denied him timely access to medications and a qualified medical provider despite the known danger.  Douglas County and SWCMG knew or should have known that inadequately controlled hypertension can cause stroke, which increases the risk of seizures, and that inadequately controlled diabetes with very low and/or high blood sugar levels can cause death, and yet failed to provide timely treatment within the standard of care despite the known danger. Douglas County and/or SWCMG knew or should have known that the Defendants failed to enact or implement policies and procedures to protect inmates including Mr. Hartwell, and/or failed to adequately train and supervise employees to provide Mr. Hartwell with medical care for his serious medical needs.  Douglas County knew or should have known that SWCMG was withholding medications and adequate medical care by a qualified provider for Mr. Hartwell's serious medical conditions and chose to ratify those actions by concealing and/or destroying medical records and video footage of Mr. Hartwell suffering seizures in order to cover up the negligent medical care.

154.    Douglas County contracted with a private, for-profit company that it knew or should have known would withhold medications and medical care for serious medical conditions and create systemic deficiencies in the medical care at the jail in order to make a profit.  In addition, Douglas County purposefully failed to enforce contract provisions that would hold SWCMG accountable to prevent violations, and it entered into a contract with SWCMG and maintains a policy that makes SWCMG responsible for the costs of ER transfers and all medications administered, which foreseeably discourages ER transfers, physician evaluations, and consistent medication administration.  A California Grand Jury investigating SWCMG's

sister company concluded on June 8, 2016, that contract provisions that provide a disincentive for necessary medical treatment will cost lives. SWCMG knew or should have known that its systemic and gross failures to provide medications and medical care by a qualified medical provider for serious medical and potentially-life threatening needs would likely seriously harm or kill people entrusted in its care, including Mr. Hartwell.

155.    All of this conduct is an unreasonable failure to exercise reasonable care to protect against dangers of which Douglas County knew or should have known.  The violation of the Premises Liability Act directly caused, in whole or in part, Mr. Hartwell to suffer injuries and damages as set forth in Paragraph 100, *Supra*.

## SEVENTH CLAIM FOR RELIEF

### (Negligence – Dr. Moser)

156.    All of the above allegations are incorporated herein by reference.

157.    Defendant Dr. Moser was negligent in his care and treatment of Mr. Hartwell, which negligence consisted, *inter alia,* in the following:

a.  Failing to contact and/or supervise the nurses to ensure they contacted Mr. Hartwell's Primary Care Physician to obtain a current medication list on 11/10/16, or at any time thereafter;

b.  Failing to provide the nurses with oversight and supervision to ensure they contacted him when Mr. Hartwell complained of symptoms consistent with a heart attack, DKA, severe hypertension, stroke, and/or seizures;

c.  Failing to control Mr. Hartwell's diabetes,  hypertension, and seizures;

d.  Ignoring Signs of DKA beginning on November 11, 2016;

e.  Failing to urgently transfer Mr. Hartwell to a higher level of care on November 11, 2016;

f.   Failing to develop a management plan to bring Mr. Hartwell's diabetes and hypertension under control on November 12, 2016, or any time thereafter;

g.   Failing to medicate Mr. Hartwell to prevent his seizures;

h.   Failing to urgently transfer Mr. Hartwell to the ER on November 13, 2016;

i.   Failing to perform an examination within the standard of care on November 15, 2016, and to provide a comprehensive management plan and chronic care plan for Mr. Hartwell's diabetes, hypertension, and seizure disorder;

j.   Failing to review the nurse's Initial Health Assessment findings on 11/19/16, follow up on Mr. Hartwell's history of seizures, contact his PCP, and prescribe seizure medications;

k.   Failing to transfer Mr. Hartwell to a higher level of care at any time from November 20 through November 29, 2016 when he was suffering from seizures, dangerous hypertension, and uncontrolled blood sugar levels;

l.   Failing to evaluate Mr. Hartwell, order that anti-seizure medication be immediately provided at 10:00 a.m. on 11/29/16, and order immediate transfer to the ER;

m.   Allowing Mr. Hartwell to be moved to the floor of his cell and left to suffer continuous seizures in his cell on November 29, 2016 through the early morning hours of November 30, 2016;

n.   Failing to recommend policies, procedures, protocols, and/or guidelines and/or failing to implement and enforce policies, procedures, protocols, and/or guidelines that require nurses to contact a doctor or send prisoners to the ER rather than practice outside the scope of their licenses.

41

158.    Defendant's negligence, in whole or in part, was the proximate cause of Plaintiff's injuries and damages. "But for" the denial of necessary medications and medical care by qualified medical providers, Mr. Hartwell would not have been injured and damaged as set forth in Paragraph 100, *Supra*.

159.    Plaintiff reserves the right to request punitive damages after sufficient discovery has been completed.

**EIGHTH CLAIM FOR RELIEF**

**(Negligence – SWCMG, Douglas County, Spurlock, Duffy)**

160.    All of the above allegations are incorporated herein by reference.

161.    Defendants were negligent in their care and treatment of Mr. Hartwell, which negligence consisted, *inter alia,* in the following:

   a.   Failing to adequately train, supervise, and/or provide oversight to nursing staff to:

- ensure they obtain a current medication list at intake,

- perform an initial health exam within the standard of care,

- communicate important information to a physician, including but not limited to when an inmate has dangerously high blood pressure; dangerously high, low, or fluctuating blood sugars; seizures; and/or symptoms consistent with possible heart attack,

- contact a physician or send an inmate to the ER for potentially life-threatening emergencies if a physician cannot be reached,

- practice within the scope of their nursing licenses,

- practice within a nursing standard of care,

- document medication administration and orders,

- obtain and administer medications that have been ordered by a physician,

- follow all doctor's orders and document the information.

b.  Failing to enact and/or implement and enforce policies, procedures, protocols and/or guidelines that require:

- adequate staffing levels, including physician access;

- nurses to practice within the scope of their licenses;

- immediate transfer to an ER for potentially life-threatening emergencies that require a higher standard of care than is being provided at the jail;

- administration of needed medications;

- access to a qualified medical provider for serious medical conditions;

- contact with PCPs to determine current medications and medical problems;

- an initial health assessment that meets the legal requirements and standard of care;

- documentation within the standard of care;

- documentation and information be transferred to the ER with an inmate, including but not limited to failing to tell the ER that Mr. Hartwell had a seizure disorder, had been denied seizure medications, had been having continuous seizures, and then failing to provide the ER with Mr. Hartwell's medical records for days.

    c.   Concealing and destroying evidence including medical records and video footage in order to cover up the Defendants' negligence, which confused the physicians at the hospital trying to provide Mr. Hartwell emergency treatment to save his life as well as thwarted efforts to hold the Defendants accountable.

    d.   Contracting in a manner that foreseeably creates incentives to deny inmates, including Mr. Hartwell, necessary medications and/or medical care for serious medical conditions, and/or the failure to enforce safety provisions in contracts;

    e.   Creating a culture at the jail whereby physicians and nurses were expected or required to deny necessary medical care in order to cut costs and make a profit.

162.     Douglas County had a non-delegable duty to provide medical care within the community standard of care to detainees, including Kevin Hartwell.  C.R.S. § 16-3-401; *McGill v. Correctional Healthcare Cos., Inc.*, No. 13-cv-01080-RBJ-2014 WL 5423271, at *6-7 (D.Colo. Oct. 24, 2014) (holding that a county sheriff could be indirectly liable for a private healthcare provider's constitutionally inadequate training of its nurses); *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 705-06 (11th Cir. 1985); *Trujillo v. City & Cty. Of Denver*, No. 14-CV-02798-RBJ-MEH, 2016 WL 5791208, at *12–15 (D. Colo. Sept. 7, 2016) (holding jail responsible for failure of Denver Health Medical Center to treat prisoner on the basis that jails owe a non-delegable duty to provide medical care to detainees and prisoners even when the medical provider is being sued, citing *West v. Atkins*, 487 U.S. 42, 56 (1988)); *Anglin v. city of Aspen, Colo.*, 552 F.Supp.2d 1229, 1244 (D.Colo. 2008) (by choosing to delegate its constitutional duties to the professional judgment of others, the state cannot thereby avoid all liability); *Poudre Valley Health Care Inc. v. City of Loveland*, 85 P.3d 558, 560 (Colo. App. 2003) (General Assembly intended to place the duty to provide such medical care on the entities holding the detainees); *Hippele v. Palm Beach Cty. Bd. Of Cty. Comm'rs*, No. 09-80089-CIV,

2010 WL 3123258, at *4 (S.D. Fla. Aug. 9, 2010) (local governments have a non-delegable duty, under the United States Constitution and state law, to provide medical care to inmates and, thus, local governments cannot avoid liability under § 1983 by contracting with private entities to fulfill that duty).

163.    The widespread, systemic failures in managing Mr. Hartwell's medical care by the Defendants put all detainees and inmates at risk, and led to Mr. Hartwell's stroke and status epilepticus, kidney failure, respiratory failure, oxygen deprivation, and brain damage.

164.    The Defendants are liable for their own negligence that, in conjunction with the negligence of the other defendants, caused Plaintiff's injuries and damages as described in Paragraph 100, *Supra*.

165.    Plaintiff reserves the right to request punitive damages after sufficient discovery has been completed.

## NINTH CLAIM FOR RELIEF

### (Loss of Consortium – Barbara Hartwell)

166.    All of the above allegations are incorporated herein by reference.

167.    As a proximate result of each Defendant's conduct, in whole or in part, and pursuant to Mr. Hartwell's claims under state law, Barbara Hartwell has been injured and damaged in the following particulars:

(a)    Mrs. Hartwell is now married to a different person, and a more fragile person.  The husband she chose to live her life with is constantly fatigued, cognitively impaired, and always in fear of succumbing to another seizure and another bout of hospitalization.  He now requires frequent hospitalization for seizures that can no longer be controlled, and Mrs. Hartwell has become his caregiver.

(b)      Mrs. Hartwell has suffered a loss of companionship with the person she married, and loss of assistance with household services.

168.      Ms. Hartwell has suffered injuries and damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs pray for judgment to be entered against each of the Defendants, jointly and/or severally, in an amount sufficient to compensate Plaintiffs for all of their injuries, damages, and losses together with pre-judgment interest at the highest rate allowed by law, for attorney's fees, for punitive damages pursuant to Title 42 U.S.C. § 1988, and for litigation costs including expert witness fees, and they reserve the right to request exemplary damages for state law claims, and for such further relief as the Court deems just and equitable.

Dated this 26th day of April, 2018.

Respectfully submitted,

By:      /s/ Galen Trine McMahan
Galen Trine McMahan, #47879
Metier Law Firm LLC
4828 South College Avenue
Fort Collins, CO 80525
Phone: 970-377-3800
Fax: 866-377-3800
Email: galen@metierlaw.com

/s/ Cheryl Trine
Cheryl Trine, #38150
Trine Law Firm LLC
155 E. Boardwalk Drive #400
Fort Collins, CO 80525
Phone: 970-391-9442
Fax: 970-458-1800
Email: ctrine@trinelaw.net

**PLAINTIFF DEMANDS TRIAL TO A JURY OF SIX PERSONS.**

Plaintiffs' Address:
602 South Street, #A
Castle Rock, CO 80104

## <u>CERTIFICATE OF SERVICE</u>

On this 26th day of April, 2018, I filed and served the foregoing document, via CM/ECF

and/or U.S. Mail upon the following:


Kelly Dunnaway, Esq.
Dawn Johnson, Esq.
Douglas County
100 Third Street
Castle Rock, CO 80104

Ann B. Smith, Esq.
Sara Cook, Esq.
Gordon L. Vaughan, Esq.
Vaughan & DeMuro
111 South Tejon, Suite 545
Colorado Springs, CO 80903


*/s/ Cheryl Trine*
*Cheryl Trine*