## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:17-cv-02278-RBJ

KEVIN HARTWELL,
BARBARA HARTWELL,

      Plaintiffs,

v.

CORRECTIONAL MEDICAL GROUP COMPANIES INC., d/b/a SOUTHWEST CORRECTIONAL MEDICAL GROUP, LLC, d/b/a SOUTHWEST CORRECTIONAL MEDICAL GROUP PLLC, d/b/a COLORADO CORRECTIONAL MEDICAL GROUP, PLLC
DOUGLAS COUNTY,
TIMOTHY G. MOSER, MD, in his individual and official capacity,
SOPHIA NIX, LPN, in her individual and official capacity,
DAISHA WADE, LPN, in her individual and official capacity,
STEPHANIE RUSSAK, RN, CHARGE NURSE, in her individual and official capacity,
JESSICA ISAACS, RN, in her individual and official capacity,
DEIMYS VIGIL, RN, in her individual and official capacity,
LINDSEY GYGER, RN, in her individual and official capacity,
EMILY BARRON, RN, in her individual and official capacity,
KATHRYN DAVIDSON, LPN, in her individual and official capacity,
JENNIFER TRIMBLE a/k/a GLENN, RN, HSA, in her individual and official capacity,

      Defendants.

_____

## SECOND AMENDED COMPLAINT AND JURY DEMAND
_____

      COME NOW, Plaintiffs Kevin Harwell and Barbara Hartwell, by and through their attorneys Metier Law Firm, LLC, and Trine Law Firm LLC, allege and complain as follows:

### JURISDICTION

      1.    This is a civil action for damages and attorney's fees and costs, for the violation of Plaintiff Kevin Hartwell's civil rights.  Jurisdiction is invoked under Title 42 U.S.C. §§ 1983 and 1988, and the Fourteenth and Eighth Amendments to the Constitution of the United States.

2.      This Court has supplemental jurisdiction to consider state causes of action under 28 U.S.C.A. §1367, the ancillary state claims which "form part of the same case or controversy" as other counts for which this Court has established jurisdiction.

## VENUE

3.      Venue properly lies in the District of Colorado pursuant to 28 U.S.C. §1391(b).

## PARTIES / DUTIES

4.      The Plaintiffs, Kevin and Barbara Hartwell, are residents of Colorado and citizens of the United States.

5.      At all times material hereto, the Defendant nurses and doctor were residents of Colorado and citizens of the United States.

6.      At all times material, Correctional Medical Group Companies Inc. (CMGC), is located in 12220 El Camino Real, Suite 310, San Diego, CA 92130, and is doing business in Colorado as Southwest Correctional Medical Group, LLC and/or as Southwest Correctional Medical Group, PLLC, and as Colorado Correctional Medical Group PLLC. **Hereinafter all entities will be referred to as "CMGC"**.

7.      At all times material hereto, Defendant Moser, M.D. was licensed to practice medicine in Colorado, specializing in Family Medicine.

8.      At all times material hereto, the Defendant nurses were licensed to practice nursing in Colorado.

9.      Sheriff Spurlock is a final policy maker for Douglas County, who at times delegated his authority to CMGC and/or to Douglas County employees, including but not limited to Captain Duffy.

10.     At all times material hereto, Defendants Dr. Moser and the Defendant nurses were employees and/or agents of CMGC, acting within the course and scope of their employment and acting under color of state law.

11.     At all times material, Douglas County had a non-delegable duty to provide detainees including Mr. Hartwell with necessary medical care and treatment from qualified medical providers that meets a community standard of care.

12.     To the extent Douglas County delegated authority to make official policy decisions to CMGC, either expressly or by default, the policies and customs of CMGC become the policies and customs of the county, and the county is liable for their actions if the policy and actions proves unconstitutional.

13.     Nurses licensed to practice in Colorado are required to adhere to the Nurse Practice Act, which requires LPNs to complete a 9 to 11-month course, after which they are qualified to "identify normal from abnormal in each of the body systems and to identify changes in the patient's condition, which are then reported to the RN or MD for further or 'full' assessment."

14.     RNs supervise LPNs, and cannot delegate nursing assessments to LPNs.

15.     RNs must cannot diagnose or treat medical illness without a doctor's order.

16.     Jennifer Trimble a/k/a Glenn, RN is the Health Services Administrator (HSA) for CMGC at the Douglas County Jail, responsible for hiring, training, scheduling, supervising, and overseeing nurses to ensure medications are administered consistent with CMGC policies and procedures; ensure the accuracy of records of medications and treatments administered; and communicate with the physician any potentially significant medical complaint or observation.

17.     During November of 2016, there was no mid-level provider at the jail despite a contract requirement for a midlevel provider for 8 hours per week.

18.     Dr. Moser was the "On-Site Medical Director" for CMGC, responsible per his contract with CMGC for overall responsibility for medical care of inmates at the jail and oversight of the health care services provided by nurses at the jail.  He had a long list of contractual duties that included training nurses and custody staff; performing quality assurance; reviewing and developing procedures and protocols for medical care; supervising the care and treatment of Special Housing Unit patients including Hartwell, and performing sick call "as scheduled."

19.     CMGC paid Dr Moser $147.00 per hour to come into the jail for six hours per week, and $100 per week to be on call 24/7.

20.     Dr. Moser kept no record of any phone calls he received and orders he may have issued while on-call 162 hours per week. He never came into the jail while on-call, and he never evaluated inmates unless an appointment had been previously scheduled, even when he was present in the facility.  It was his custom and practice to rely on nurses, including LPNs to tell him whether they thought inmates, including Mr. Hartwell, were faking acute neurologic changes, and he followed their recommendations.

**FACTUAL ALLEGATIONS**

21.     Douglas County contracted with CMGC on February 16, 2016, to provide medical care at the jail.

22.     At least two inmates before Hartwell were denied medications by CMGC until they entered status epilepticus or continuous seizures, a life-threatening emergency.

23.     In July of 2016, inmate Benjamin Ramsey was denied medications including medications for seizures at the jail until he went into status epilepticus.

24.     Four months later, Kevin Hartwell was denied medications for seizures at the jail until he went into status epilepticus for over seven hours before EMS was contacted.

4

25.     Kevin Hartwell's story begins on November 10, 2016, when he was arrested after punching a surface of his home and breaking his hand.

26.     On the way to jail, Mr. Hartwell was taken to Castle Rock Adventist Hospital to have his broken hand checked.

27.     At the hospital, his current medications were reconciled and listed as including prescriptions for hypertension, diabetes mellitus, seizures, and pain.

28.     The previous day, on November 9, Mr. Hartwell had been to his primary care physician, Dr. Drew Werner, who listed his active problems as hypertension, diabetes mellitus, seizures, acid reflux, neuropathy, and pain.

29.     Prior to incarceration, Mr. Hartwell took Keppra and Diazepam, administered 3-4 times per day for seizures.

30.     As of November 10, 2016, Mr. Hartwell also had documented hypertension.

31.     Failure to manage high blood pressure creates a risk of stroke and seizure, and stroke itself increases ongoing seizure risks.

32.     It is foreseeable that if Mr. Hartwell did not receive his anti-seizure medications, he would suffer seizures and then status epilepticus.

33.     Status epilepticus is defined as a seizure lasting more than 5 minutes or multiple seizures occurring back-to-back without a full return of consciousness in between, and it is a medical emergency.

34.     Permanent brain damage occurs after 20 minutes of status epilepticus, and the longer the duration of status epilepticus before treatment, the more difficult it is to stop.

**DAY 1**

35.     On November 10, 2016, Mr. Hartwell came directly from the hospital to the jail, and he informed Emily Barron, RN that he had been last hospitalized for a seizure, although he could not remember all his medications.

36.     Nurse Barron recognized she needed to get Hartwell's medication orders and knew the identity of his primary care physician and the hospital from which he had been transferred, but failed to request records from the hospital or Hartwell's primary care physician.

37.     It was the widespread custom and practice at Douglas County Jail in 2016 to cut inmates off medications prescribed by treating physicians.

**DAY 2**

38.     Knowing Mr. Hartwell could not remember all his medications or their dosages, Nurse Vigil did not contact his physician or the hospital from which he was directly transferred.

39.     Instead, Nurse Vigil contacted Walgreens and in so doing, failed to obtain Hartwell's active prescriptions for hypertension because it was a 90-day prescription, and she failed to get his active prescription for seizures which had been filled 33 days prior to incarceration.

40.     Nurse Vigil obtained the correct dose of Lantus for Hartwell's diabetes, and then proceeded to cut it almost in half without a physician's order.

41.     Lantus is far more expensive than sliding scale insulin.

42.     Hartwell was cut off diazepam without tapering or a substitute, and never received his prescribed medications for hypertension, diabetes, and seizures.

43.     Barbara Hartwell brought her husband's medication list to the jail soon after he was arrested, but the staff refused to accept the list from her.

6

44.     The contract with Douglas County requires CMGC to be responsible for the cost of all medications administered at the Douglas County Jail with the exception of AIDS-related medications and biological medications.

45.     On November 11, 2016, after Mr. Hartwell's Lantus was cut in half by Nurse Vigil, his blood sugar was 479, which poses a significant risk of Diabetic Keto Acidosis (DKA), a life-threatening emergency.

**DAY 3**

46.     On November 12, 2016, Mr. Hartwell's blood sugar went from dangerously low at 41 to dangerously high at 409, both of which pose a serious risk of death.  Dr. Moser prescribed an injection of insulin by phone, but failed to evaluate Mr. Hartwell or follow up.

**DAY 4**

47.     On November 13, 2016, Mr. Hartwell's blood pressure was  180/120, his blood sugar was 532,  he had ketones in his urine, which is an indicator of possible DKA and he suffered a seizure in front of Nurse Isaacs in medical.  Isaacs reported to Dr. Moser by phone, but he did not evaluate Mr. Hartwell or transfer him to a higher level of care.

48.     Mr. Hartwell later that day complained of dizziness, an acute neurologic change that was ignored.

**DAY 5**

49.     On November 14, 2016, Mr. Hartwell felt dizzy and fell to the ground.   Nurse Vigil responded but failed to perform a full neurologic assessment, failed to follow a nursing protocol for "man down" or syncope or hypertension (180/120) and failed to contact Dr. Moser.

50.     That evening, Lindsey Gyger responded to Mr. Hartwell's cell for complaints of dizziness, but failed to perform a full neurologic assessment and contact a physician.

51. On November 14, 2016, Dr. Moser ordered Hartwell's insulin pump be disconnected without explanation or evaluation.

**DAY 6**

52. On November 15, 2016, at 2:00 a.m., Mr. Hartwell's blood sugar was 39, and Lindsey Gyger gave him sugar tabs but did not contact Dr. Moser.

53. At 8:00 a.m., his blood pressure was 190/110, and at 10:15 a.m., it remained dangerously high at 180/130. Nurse Vigil allegedly called Dr. Moser at his home or on his cell phone, but no additional medications were given to Mr. Hartwell.

54. The only time Dr. Moser evaluated Mr. Hartwell was later on November 15, 2016, and then he only addressed his hypertension. Dr. Moser failed to contact Hartwell's physicians or the hospital, failed to medicate his seizures, and ordered follow up in 3 months for a patient with uncontrolled hypertension, diabetes, and a 5 day old splinted hand fracture.

**DAY 7**

55. On November 16, 2016, Mr. Hartwell complained that he was not taking the medications he should be taking and asked for help. Nothing was done by any of the Defendants.

**DAYS 8-10**

56. On November 17, 2016, Mr. Hartwell's blood sugar rose to 478, and the next day, it was 418. Then on November 19, 2016, Nurse Isaacs performed an initial health assessment of Mr. Hartwell, and noted that he had a history of seizures, but failed to obtain any information about his seizures. No medications were provided to prevent his seizures.

57. Nurse Isaacs knew Hartwell had a history of seizures, diabetes, hypertension, stroke, and heart trouble, but concluded he had no significant medical issues because otherwise, Dr. Moser would be required to evaluate Hartwell sooner than the scheduled 90 days.

58.     Up to this point and continuing on until Hartwell left the jail, he was not exhibiting any signs that his medical condition was withdrawal related.


**DAYS 12-15**

59.     From November 21, 2016 to November 24th, Hartwell continued to have dangerously high blood sugar and high blood pressure issues that were uncontrolled and unattended to.

**DAY 16**

60.     On November 25, 2016, at 1:15 a.m., Mr. Hartwell was brought to medical for shakiness and dizziness.  His blood pressure was 189/110, and he was tachycardic with a pulse of 114.  He had episodes of shaking.  He was anxious, was not listening to directions, and complained of shortness of breath and nausea.

61.     Hartwell had signs and symptoms of acute neurologic changes for which a full neurologic assessment by a RN should have been done and a physician contacted, but LPN Davidson sent Mr. Hartwell back to his cell while he continued to shake, had dry heaves, was tachycardic (pulse 110), and had blood pressure of 178/98.

62.     The RN on duty, Emily Barron was required to do an assessment and call a physician, but she failed to do so.

63.     Later in the morning on November 25, Mr. Hartwell felt like his blood sugar was low, but medical refused to see him.  Around noon, he begged for help, stating he was really having a hard time and he just wanted to live.

64.     Just before 1:00 pm. Hartwell was escorted to medical where he stated that he felt like he was dying, was very anxious, could not breathe, and felt like he had a weight on his back.

His blood pressure was 160/90, and he requested a blood pressure medication.  Without contacting a doctor, Vigil sent Hartwell back to his cell, telling him to contact mental health.

65.     Vigil reported to the oncoming nursing shift that Hartwell was malingering.


**DAY 17**

66.     On November 26, 2016, at 3:19 a.m., LPN Wade came to Hartwell's cell because he was short of breath and felt like he was dying. His blood pressure was  192/112, and he was tachycardic with a heart rate of 122. LPN Wade did not contact a RN or doctor, and is not qualified to use the nursing protocol.

67.     No order was entered for blood pressure medication for Hartwell and he was not administered any blood pressure medications or monitored.

68.     RN Barron did not do an assessment or contact the doctor.

69.     November 26, at 3:47 p.m., Hartwell was sitting at a table when he started to shake and fell back from the chair striking his shoulder to the floor before hitting his head, where his body appeared to be ridged with his arms tucked near his chest, spitting small bubbles from his lips, and with his eyes were rolling up and back towards the right.

70.     Nurse Vigil  responded at 3:50 p.m. where she found Hartwell on the floor, hyperventilating, and when she rolled him onto his side, he suffered a second seizure with shaking, rolling of his eyes, and an inability to respond.

71.     This was the second documented seizure on November 26, and Hartwell should have been sent to the ER, but Vigil brought him to medical in a wheel chair where he had altered consciousness and could not remember what had happened.

72.     Vigil sent Hartwell back to his cell without contacting a doctor, and without providing any medications for Hartwell's seizures.

73.     Nurse Vigil knew that Mr. Hartwell exhibited acute neurologic changes, and she knew that she was required to do a full neurologic assessment and contact a doctor.

74.     Nurse Vigil knew Hartwell had had seizures but thought he was faking.

75.     For any acute neurologic change including seizure activity, a RN must do an assessment that includes timing and duration of seizures. If there is continuous seizure activity without complete return to normal consciousness in between seizures for 5 minutes, a RN should call 911 immediately. If seizure activity stops within 5 minutes with complete return to consciousness, a RN must call a doctor and immediately begin ordered medications, and monitor the patient by performing full neurologic assessments that are documented. If there is no RN on duty to monitor patient, 911 should be called so the patient can be monitored by a RN and get loading doses of IV medications as needed. If 2 seizures occur within a 48 hour period without a recent hospitalization for seizures or work up by neurologist, a nurse must send patient to the ER.

76.     On November 26, 2016, at 4:30 p.m. a licensed professional counselor at the jail indicated that Hartwell was reporting high anxiety, med seeking, and faking seizures.

**DAY 19**

77.     On November 28, 2016, Mr. Hartwell's blood sugar rose to 535, the highest recorded amount at the jail. With an earlier blood sugar of 532, Mr. Hartwell had chemical evidence suggesting DKA, which presents an obvious risk of serious harm. The charge nurse, RN Russak noted that she contacted Dr. Moser. He failed to evaluate Mr. Hartwell despite the obvious substantial risk of serious harm, order follow up tests for DKA, or send him to the ER. Hartwell was sent back to his cell.

**DAY 20**

78.     On November 29, 2016, at 9:30 a.m., Deputy Mathis called medical because while Hartwell was on the phone with his wife, he had a blank look on his face and was having a hard time understanding what the deputy was saying.

79.     At 9:35 a.m., Mr. Hartwell was observed lying on his right side in his bed convulsing with his legs locked in the straight position and his arms crossed, and he would not respond to anything that was said to him.

80.     At 9:36, Nurses Russak and Wikert responded to Mr. Hartwell's cell.  Neither did a full neurologic assessment.

81.     Nurse Russak documented in a late entry at the end of her shift that at 10:00 a.m., Hartwell was having a seizure and his oxygen level was 77% with an increase to 90% on oxygen.

82.     Nurse Russak reported bringing Mr. Hartwell to medical and contacting Dr. Moser who allegedly ordered Keppra for his seizures.  Keppra was not actually ordered or administered to Mr. Hartwell.

83.     Dr. Moser was in medical when Hartwell was brought in for observation, and yet Dr. Moser did not evaluate him because he only sees patients who were previously scheduled.

84.     While in medical for observation, Nurse Wikert did one assessment that was not a full neurologic assessment.  It was documented at 10:18 a.m.

85.     It is not documented who decided to return Mr. Hartwell to his cell at 1:33 p.m., or the basis for the decision.

86.     Nurse Russak wrote in the nurse shift report at 6:15 p.m.,  that Mr. Hartwell had a seizure today and she passed that information to RN Gyger and LPN Nix at shift change.

87.     At 8:16 p.m. on November 29, 2016, RN Gyger and LPN Nix were called to Mr. Hartwell's cellbecause he was acting strange.

12

88. Nix got Hartwell to sit up for a blood pressure check, at which point he went into convulsions. The nurses should have immediately contacted 911.

89. Hartwell suffered multiple additional seizures right in front of the nurses without regaining consciousness.

90. RN Gyger spent less than four minutes in Hartwell's cell and failed to perform an assessment and called the doctor

91. LPN Nix walked out of the cell during a seizure.

92. LPN Nix called Dr. Moser and he ordered Clonidine for blood pressure.

93. At 8:28 p.m., Nix returned to Hartwell's cell without Gyger where Hartwell was unconscious and seizing.  Nix again walked out of his cell in the middle of a seizure.

94. At 8:31 p.m., Nix returned to Hartwell's cell without Gyger.

95. When LPN Nix entered Hartwell's cell, he was seizing.

96. LPN Nix did a sternal rub with no response, and wrestled Hartwell around on the bed trying to get him on his side when his limbs were stiff and shaking, and he was unconscious.

97. Nix watched Hartwell suffer multiple seizures without regaining consciousness before she again walked out of his cell in the middle of a seizure around 8:37 pm.

98. LPN Nix reported to Dr. Moser that Hartwell refused to take his medications and she thought he was faking seizures.

99. Dr. Moser allowed a LPN to assess a patient and then relied on that assessment rather than send Mr. Hartwell to the hospital, knowing that he had suffered seizures earlier in the day for which Dr. Moser allegedly prescribed Keppra.

100 Dr. Moser ordered a LPN to monitor Mr. Hartwell.

101. At 10:40 p.m., Nix and Gyger returned to Hartwell's cell, where Gyger observed Hartwell for one minute, primarily from the doorway to his cell.

102.  Hartwell continued in status epilepticus, unconscious and seizing.

103.  At 10:53 p.m. Nix directed the deputies to move Hartwell to the floor, and left.

104.  Nix called HSA Trimble, who told her not to go into Hartwell's cell again to monitor him because earlier in the day, Hartwell had faked a seizure.

105.  No one entered Hartwell's cell again until 3:35 a.m. the next day.

106.  Every half hour or so, a deputy walked past the window of Hartwell's cell to see if he was still breathing, but the deputies never did anything else to help Hartwell.

107.  Lindsey Gyger RN failed to do any assessment, failed to follow the nurse protocols for seizures or "man down" (emergency), failed to provide oxygen, and failed to call EMS or even contact the doctor.

108.  Gyger knew that a LPN is not qualified to do an assessment.

109.  It was the custom and practice at the Douglas County Jail in 2016 for LPNs to practice outside the scope of their licenses.

110.  Neither a RN or LPN is qualified to rule out seizures.

111.  It was the custom and practice at the jail for nurses to decide whether inmates were faking medical illness.

112.  Gyger knew in 2016 that the risk of a nurse deciding whether an inmate is faking serious illness is that the nurse is wrong and the inmate is seriously injured or killed.

113.  Mr. Hartwell suffered at least numerous seizures while being monitored by Nix and detentions staff.

114.  At 3:35 a.m. on November 30th 2016, Nix came back to Hartwell's cell without a RN.  Hartwell was in distress

115.   Nix left Hartwell to call Dr. Moser, and only after that did she initiate a call to EMS and provide oxygen to Hartwell.

14

116.     Nix falsely reported to EMS that they found Hartwell in his cell seizing around 3:30 a.m., and there were no witnesses.

117.     Hartwell was transferred Emergent to the hospital and continued to seize throughout transport and transfer of care.

118,     At the hospital, Mr. Hartwell continued to have seizures requiring intravenous medications. Hartwell was in respiratory failure, and acute kidney failure as a result of muscle damage from continuous seizures.  A MRI revealed an acute stroke deep in the right side of his brain.  He was diagnosed with status epilepticus, intractable complex partial seizures, stroke, shock, respiratory failure, and kidney failure.  Mr. Hartwell's prolonged status epilepticus caused him to suffer permanent brain damage.

119.     On the morning of November 30th, ICU ran tests to try to determine which medications the patient was on prior to entering jail because they did not have jail records.

120.     HSA Trimble was responsible to provide the hospital with Hartwell's medical records, and she knew there was a substantial risk that doctors would be unable to effectively diagnose and treat Mr. Hartwell's life threatening condition without Hartwell's medical records from the jail.  Her failure to provide timely information placed Hartwell at risk of increased injury and death.

121.     A thalamic infarct (stroke) was detected at the ICU through objective imaging. Tissue Plasminogen Activator (tPA) can mitigate the long-term damage of stroke.  However, ICU staff noted that Mr. Hartwell was not a tpa candidate due to unclear timing of symptom onset.  122.     The hospital contacted Mrs. Hartwell, but the County would not allow her to see her husband without a court order, which she obtained.  It was Mrs. Hartwell who informed the ICU doctors that her husband had standing prescriptions for Keppra and Diazepam for seizures. CMGC did not provide accurate information or timely provide Hartwell's medical records.

15

123.     Fourteen days after arrival, on December 13, Mr. Hartwell was responsive enough to be transferred to a rehabilitation facility.

124.     In early 2017, Mr. Hartwell was discharged into home-care.  At present, his seizures are no longer controlled, and he suffers seizures without warning.

125.     Mr. Hartwell suffered a permanent brain injury. He struggles to care for himself, and suffers from tremors and cognitive delays.  He has required emergency care with ambulance transfers since the initial stroke and prolonged status epilepticus.

126.     CMGC did not conduct any quality assurance review or investigation of any type into why Mr. Hartwell was not provided seizure medications or sent to the ER sooner, and neither Moser nor any nurses were informed of Hartwell's injuries until they were sued.

127. CMG did not change any policies or care procedures after the two previous seizure incidents and injuries that came before Hartwell.

128.     Shortly after Hartwell's transfer to the emergency department, Captain Duffy communicated with  deputy Methena there was an inconsistency with the records and reports of what actually occurred to Mr. Hartwell.

129.     Sergeant Mathena and Captain Duffy met on December 7, 2016.  There are no notes of this meeting and it was not recorded.  Other than Mathena, no witnesses were interviewed, no statements obtained, no reports were issued, and no changes were made to any policies or procedures.

130.     As a result of his injuries, Mr. Hartwell was damaged in the following particulars:

(a)      Non-economic damages consisting of past and future physical pain, suffering, anxiety, emotional distress, stress, fear, and loss of enjoyment of life;

(b)      Past and future medical, rehabilitation and other health care expenses for

his physical injuries;

(c)      Home services expenses;

(c)      Permanent injuries including but not limited to brain damage and ongoing

seizures;

(d)      Permanent impairment.


### FIRST CLAIM FOR RELIEF

**(42 U.S.C. § 1983 claim under the 8th and 14th Amendments to the US Constitution against Moser, Trimble, Gyger, Nix, Wade, Russok, Isaacs, Barron, Davidson, and Vigil)**

131.    Plaintiffs incorporate herein all previous allegations and statements.

132.    At all times material, Defendants Moser, Trimble, Gyger, Nix, Wade, Russok, Isaacs, Barron, Davidson, and Vigil had a legal duty to provide medical care to inmates within the standard of care for the community.  The Defendants violated that duty by knowingly and purposefully denying Mr. Hartwell necessary medical care and treatment by qualified medical providers for his serious medical conditions, including his status epilepticus, seizures, hypertension, and diabetes, despite the known substantial risk of serious harm.

133.    The failure to determine which medications an inmate with a history of seizures has been prescribed and should be administered presents an obvious substantial risk of serious harm.

134.    Nurse Barron documented on intake that Mr. Hartwell was hospitalized for seizures in the previous year, but both she failed to obtain any additional information about his seizures, and failed to contact the hospital to get his medication list and to determine what treatment had been provided despite the obvious risk of providing insulin if insulin had just been administered

at the hospital.  She documented the name of Hartwell's prescribing physician, and yet none of Defendants contacted the hospital or any physician about Mr. Hartwell.

135.    Nurse Vigil deliberately cut Hartwell off prescribed medications despite the obvious substantial risk of serious harm in denying a brittle diabetic with hypertension and seizures his medications, despite being the nurse who cut inmate Ramsey off his doctor-ordered medications when he came directly from the hospital four months earlier.

136.    Beginning on November 11, 2016, and continuing, Dr. Moser knew that Mr. Hartwell's extremely high blood sugar levels and hypertension posed a significant risk of DKA, a life-threatening emergency because nurses contacted him, but he failed to take reasonable measures to abate the risk including a careful evaluation and development of a comprehensive plan to manage Mr. Hartwell's medical condition and medications, and contact with Hartwell's primary care provider.  It was Dr. Moser's custom and practice to sign off on nurse orders including orders for medications without any investigation or evaluation, allowing nurses to practice medicine without a license.

137.    On November 13, 2016, Dr. Moser knew Mr. Hartwell's blood pressure was dangerously high at 180/120, and that his blood sugar was 532 with ketones in his urine, which is an indicator of possible DKA, a life-threatening emergency because the nurse called him.  He knew that while he was on the phone with the nurse, Mr. Hartwell slumped over, zoned out and shook, consistent with a seizure, but Moser failed to take reasonable measures to abate the substantial risk of serious injury.

138.    On November 13, 2016, Nurse Isaacs observed Harwell zone out, slump over, and shake, which are acute neurologic changes which must be reported to the physician.  To the extent Isaacs failed to accurately report information to Dr. Moser, then she failed to fulfill her gatekeeper role and instead made a medical decision about the cause of Hartwell's acute neurologic changes.

139.     On November 15, 2016, Dr. Moser finally saw Mr. Harwell, but his examination was woefully inadequate.  Dr. Moser knew Hartwell had seizures because it was noted at intake, and because Hartwell had a seizure two days earlier, but Dr. Moser failed to order seizure medications or contact Hartwell's doctor. Dr. Moser did not take reasonable measures to abate the known substantial risk of serious harm to Mr. Hartwell.

140.     In performing an initial health assessment of Hartwell on 11/19/16, Nurse Isaacs noted Hartwell had seizures, which she had observed six days earlier, knew the substantial risk of serious injury from unmedicated seizures, but failed to take reasonable measures to abate the risk by obtaining information about the seizures and contacting Dr. Moser.  She knew she was a gatekeeper and she failed to fulfill her gatekeeper role. She documented that Hartwell had no significant issues in order to prevent access to Dr. Moser sooner than 90 days.

141.     The nurses, including Barron, Isaacs, Vigil, Gyger, Davidson, and Russak routinely failed to report abnormal blood pressure and blood sugar readings to Dr. Moser, failing to fulfill their gatekeeper roles.

142.     On November 24, 2016, at 6:16 p.m., Hartwell had a blood pressure of 190/104, and a pulse of 110, which is considered a medical emergency requiring EMS, but RN Barron failed to do any type of examination and failed to contact a medical provider.

143.     Similarly, RN Vigil failed to contact Dr. Moser on November 13, 2016, when Hartwell had a blood sugar of 355 and a blood pressure of 180/120, a medical emergency. Again, on November 14, 2016, Hartwell had a blood sugar of 353 and blood pressure of 180/120, and Vigil used the nursing protocol to give half the required dose of Clonidine without sending Hartwell to the ER or contacting Dr. Moser.  On November 15, 2016, Nurse Vigil documented that at 8:00 a.m., Hartwell's blood pressure was 190/110 and that on arrival in medical, it was

180/130, he was complaining of headache, and that a "different nurse" medicated him.  The nurses

neither sent Hartwell to the ER, nor contacted Dr. Moser.

144.    It was the custom at the jail for LPNs to practice outside the scope of their licenses

by failing to fulfill their gatekeeper roles, and for RNs, who are required to supervise LPNs, to

allow and rely on LPNs to do assessments and use nursing protocols.

145.    On November 13, 2016, Nurse Wade entered an order for Ibuprofen for Hartwell

per nursing protocols without any corresponding note or assessment. The use of nursing protocols

is outside the scope of practice of a LPN.  Wade commonly practiced outside the scope of her

license.

146.    On 11/26/16, Mr. Hartwell notified Nurse Wade, LPN that he felt he was dying,

and complained of shortness of breath, with blood pressure of 192/112, and a heart rate of 122, but

she failed to contact a physician or arrange for transfer of Mr. Hartwell to the ER. She used a

nursing protocol for hypertension, but did not enter an order or provide any medication to Hartwell,

who suffered a stroke while at the jail.

147.    Nurse Barron failed to do an assessment on November 26, or contact a physician,

and she allowed a LPN to practice outside the scope of her license.

148.     Nurse Barron did the same thing with Kathryn Davidson on 11/25/16, when

Hartwell was sent to medical for a blood pressure of 189/110, pulse of 114, shaking, nausea, and

dry heaves.  LPN Davidson failed to contact a physician or send Hartwell to the ER, and did not

order or provide medications for hypertension. Davidson sent Hartwell back to his cell.

149.    Similarly, RN Gyger allowed LPN Nix to practice outside the scope of her license

and failed to fulfill her gatekeeper role on 11/29/16.  Gyger and Barron knew that LPNs were not

allowed to do assessments and make treatment decisions, and yet they knowingly acquiesced in

allowing LPNs to practice outside the scope of their licenses.

150.     It was common for RN's, including Isaacs, Barron, Gyger, and Vigil to fail to fulfill their gatekeeper roles by failing to contact a physician.

151.     Medications can only be given per nursing protocols during a medical emergency, rather than allowing nurses to practice medicine without a license, but it was the custom at the jail for nurses, including LPNs to use protocols to prescribe medications without contacting a doctor.

152.     Vigil failed to fulfill her gatekeeper role despite a known substantial risk of serious injury.   On 11/25/16, RN Vigil knew that earlier Hartwell had a blood pressure of 189/110, shakiness, and dry heaves, complained to her later that day that he felt like he had a weight on his back, could not breathe, and was dying.   She failed to fulfill her gatekeeper role and practiced outside the scope of her license by telling Hartwell to notify mental health and lay down in his pod without contacting a doctor.

153.      On 11/26/16, RN Vigil again failed to fulfill her gatekeeper role. At 4:00 p.m. that day, after Hartwell had a pulse of 122, blood pressure of 192/112, shortness of breath and felt like he was dying, he suffered focal seizures, with behavior typical for focal seizures.  Nurse Vigil went to his pod where she observed a second seizure, which required Hartwell be sent to the ER immediately. Vigil failed to contact a doctor, and instead brought Hartwell to medical where she decided he was faking his seizures and sent him back to his cell without contacting a physician. The nurses failed to do blood pressure checks for two days after that despite an obvious substantial risk of serious harm.

154.     On November 28, 2016, Mr. Hartwell's blood sugar rose to its highest level at 535. Nurse Russak contacted Dr. Moser, who still failed to evaluate Mr. Hartwell, examine his medications, or transfer him to the ER.

155.     On 11/29/16, Nurse Russak, the Charge Nurse, allegedly contacted Dr. Moser and received an order for seizure medication, Keppra, but did not enter the order or provide the

medication. She knew of the substantial risk of serious injury from untreated seizures, but failed to take reasonable measure to abate the risk including monitoring Hartwell.  She never documented performing any neurologic assessment before sending Hartwell back to his cell without medicating his seizures.

156.    Dr. Moser was present in the medical clinic on 11/29/16, but refused to evaluate Hartwell or have him transferred to the ER where he could be evaluated and monitored.  Dr. Moser was   deliberately indifferent to a substantial risk of serious harm by sending Mr. Hartwell to his cell.

157.    That night, Hartwell entered status epilepticus in front of LPN Nix and RN Gyger. Both nurses knew that a LPN is not qualified to perform an assessment.  Gyger was deliberately indifferent in failing to take control of a medical emergency, follow the nursing protocol for seizures or emergencies, do a neurologic assessment, and call 911.  She and Nix had been informed by Russak at shift change two hours earlier that Hartwell had a seizure that morning, and they observed many seizures without a return to consciousness but failed to fulfill their gatekeeper roles. Around 10:30 p.m., after Hartwell had been in status epilepticus for over two hours and had a blood oxygen level of 84%, Nix instructed detentions staff to move Hartwell from his bed to the floor because of the seizures and then left him alone in his cell.

158.    It was Dr. Moser's custom and practice to sign off on anything a nurse recommended without performing a medical evaluation or investigation.  He routinely allowed nurses to practice medicine without a license despite the substantial risk of serious harm to his patients.  He customarily relied on LPNs to provide him treatment recommendations and he followed those recommendations rather than evaluate the inmate himself or order the inmate be sent to the ER for potential life-threatening emergencies, despite the obvious substantial risk of serious injury. As Medical Director at the jail for CMGC, it was his job to direct and supervise the

nurses, with whom he was familiar, and to know the scope of practice of LPNs and RNs under his supervision. In addition, Dr. Moser knew that Mr. Hartwell was suffering seizures on November 29, 2016, because he ordered seizure medication earlier that day, was present in medical when Hartwell was brought in for observation, and seizures are documented in Mr. Hartwell's medical records. Yet, he failed to order immediate transfer to the ER after the second seizure on November 29, which occurred shortly after 8:00 p.m. Having a LPN "monitor" a potential life threatening condition is not a reasonable measure to abate the risk, and did nothing to abate the risk. It resulted in delay in access to a qualified medical provider. Dr. Moser then failed to follow up with his patient, perform any investigation, provide any additional training or supervision to nurses, take any corrective actions, or make any recommendations for changes.

159.   HSA Trimble was deliberately indifferent in telling nurses, including but not limited to Nix that Hartwell was faking seizures. Trimble ordered that a man suffering continuous seizures, a medical emergency, be left in his cell alone. When Gyger allegedly left the jail around 2:00 a.m. leaving a LPN to deal with a medical emergency alone, Trimble did not find a replacement or come into the jail herself.

160.   LPN Nix made inaccurate chart notes and provided EMS incorrect information despite the known risk that treatment would be delayed.

161.   HSA Trimble delayed hospital access to Hartwell's jail medical records despite a substantial risk that Hartwell's medical treatment would be further delayed and he would die.

162.   HSA Trimble directed or acquiesced in the unconstitutional conduct that injured Hartwell, and she was deliberately indifferent in failing to conduct any investigation into Hartwell's medical treatment, and correct problems to prevent future injuries to patients, especially after Ramsey had been similarly injured.

163.    Each Defendant's conduct was a direct cause, in whole or in part, of Plaintiff's injuries and damages, which are indivisible, resulting in joint and several liability.  ***Northington v. Marin***, 102 F.3d 1564, 1569 (10th Cir. 1996).

164.    The Defendants' unconstitutional conduct caused Plaintiff's injuries and damages as set forth in Paragraph 131, *Supra* in an amount to be proved at the time of trial.

## SECOND CLAIM FOR RELIEF

### (42 U.S.C. § 1983 Municipal Liability against Douglas County and CMGC)

165.    Plaintiffs incorporate herein all previous allegations and statements.

166.    Douglas County through its final policy maker Sheriff Spurlock and/or Captain Duffy, delegated final policy making authority for medical care at the jail to CMGC.  Douglas County did not formulate any policies, procedures, or protocols for medical care, and it deferred all decisions pertaining to medical care to CMGC.  Even during medical emergencies, Detentions staff contacted nurses rather than contact 911.  Douglas County is liable for the unconstitutional policies and customs of CMGC at the Douglas County Jail in 2016.

167.    In addition, the County knew CMGC's policies and customs were substantially certain to violate inmates' constitutional rights before Hartwell was injured, but was deliberately indifferent to the risk.  After patient Ramsey was transferred to the ER on July 21, 2016, suffering from prolonged status epilepticus as a result of being denied his seizure medications, Douglas County through Sheriff Spurlock and/or those to whom he delegated authority, interviewed the nurses involved including Gyger and Vigil, knew of the unconstitutional policies and customs of CMGC that injured Ramsey, and knew that these unconstitutional policies and customs were not changed.

168.    At all times material, CMGC purposefully maintained an unconstitutional policy, practice, or custom including, among other things, the following:

a.      Requiring LPNs to work outside the scope of their license;

b.      Allowing nurses to routinely fail to fulfill their gatekeeper roles by failing to contact a physician or send inmates to the ER;

c.      Purposefully cutting inmates off prescribed medications;

d.      Being understaffed during November of 2016, with no mid-level provider;

e.      Prohibiting Dr. Moser from personally evaluating inmates other than for pre-scheduled appointments six hours per week;

f.      Requiring nurses, including LPNs to contact the HSA to determine if a seizure is "real" prior to contacting EMS;

g.      Requiring nurses to call Dr. Moser prior to contacting EMS;

h.      Directing or allowing nurses to chart that medications were provided per protocol without contacting a doctor and without entering any order for the medications or administering them to the patient;

i.      Directing or allowing nurses to make woefully inadequate and/or inaccurate chart notes, fail to perform nursing assessments, fail to follow nursing protocols for seizures and emergencies, fail to fulfill gatekeeper roles, and decide if inmates were faking serious illness;

j.      Directing or allowing Dr. Moser to rely on assessments by LPNs over the phone to decide treatment, and then direct LPNs to monitor patients rather than call 911;

k.      Refusing to investigate, correct, train, and reprimand unconstitutional behaviors, customs, and policies that resulted in serious harm to inmates including Ramsey and Hartwell, including the failure to provide any additional training on acute neurologic changes, seizures, nursing protocols, the scope of practice of a LPN, and when to contact 911.  No changes were made to prevent future injuries.

169.    There are systemic and widespread deficiencies by multiple providers in the medical care and treatment by CMGC at the Douglas County Jail, beginning with prisoners before Hartwell including Ben Ramsey, which reflect an official policy or custom of deliberate indifference to serious medical needs, and which was the cause moving force behind Kevin Hartwell's injuries.  The deficiencies were so widespread and ubiquitous as to affect all inmates with serious medical needs at the Douglas County Jail. The need for training, supervision, and adequate staffing of the medical department to avoid the risk of serious injury and death from life threatening illness, including but not limited to seizures, diabetes, and severe hypertension was obvious.  CMGC purposefully failed to adequately staff and/or train and/or supervise staff to provide detainees including Mr. Hartwell with access to medical treatment by a qualified medical provider for serious medical needs that posed a substantial risk of serious harm, all of which was the moving force in causing Mr. Hartwell's injuries and damages.

170.    Douglas County had a non-delegable duty to provide detainees including Mr. Hartwell with necessary medical care and treatment from qualified medical providers that meets a community standard of care. To the extent Douglas County delegated authority to make official policy, custom, or final decisions to CMGC, either expressly or by default, the policies and customs of CMGC become the policies and customs of the county, and the county is liable for their actions if the policy proves unconstitutional.

171.    There was a direct causal link between the constitutional deprivations as aforesaid, and the inadequate training, inadequate discipline and inadequate supervision, and/or unconstitutional policies or customs of the Defendants.

172.    Each Defendant's conduct was a direct cause in whole or in part of Plaintiff's injuries and damages, which are indivisible, resulting in joint and several liability.

173.    The Defendants' unconstitutional conduct caused Plaintiff's injuries and damages as set forth in 131, *Supra* in an amount to be proved at the time of trial.

## THIRD CLAIM FOR RELIEF

### (Exemplary damages pursuant to 42 U.S.C. § 1983 Against Defendants in their Individual Capacities)

174.    All of the above allegations are incorporated herein by reference.

175.    The actions or omissions of Defendants, as aforesaid, were reckless and callous indifference to the federally protected rights of Mr. Hartwell.

176.    Mr. Hartwell is entitled to exemplary damages pursuant to 42 U.S.C. § 1983 in an amount to be proved at the time of trial.

## FOURTH CLAIM FOR RELIEF

### (Attorney's fees pursuant to 42 U.S.C. § 1988 against all Defendants)

177.    All of the above allegations are incorporated herein by reference.

178.    Mr. Hartwell is entitled to reasonable attorney's fees as part of the costs, and expert fees in this proceeding to enforce 42 U.S.C. §1983 and §1988).

## FIFTH CLAIM FOR RELIEF

### (Negligence – Dr. Moser)

179.    All of the above allegations are incorporated herein by reference.

180.    Defendant Dr. Moser was negligent in his care and treatment of Mr. Hartwell, which negligence consisted, *inter alia,* in the following:

　　a.　Failing to provide the nurses with training, oversight and supervision to ensure they obtained Hartwell's prescribed medications, provided medications as ordered without incorrectly using nursing protocols to practice medicine, performed nursing assessments, accurately documented information, practiced within the

scope of their licenses, contacted him when Mr. Hartwell had acute neurologic changes and symptoms consistent with a heart attack, DKA, severe hypertension, stroke, and/or seizures; followed nursing protocols in medical emergencies, and called 911;

b. Failing to control Mr. Hartwell's diabetes, hypertension, and seizures;

c. Failing to urgently transfer Mr. Hartwell to a higher level of care in a timely manner;

d. Relying on nurses including LPNs practicing outside the scope of their licenses rather than personally evaluating Hartwell or sending him to the ER;

e. Failing to medicate Mr. Hartwell to prevent his seizures;

f. Failing to perform an examination within the standard of care on November 15, 2016

g. Failing to evaluate Mr. Hartwell and order immediate transfer to the ER on 11/29/16 shortly after 10:00 a.m.;

h. Failing to order contact with EMS with Hartwell's first seizure shortly after 8:00 p.m. on 11/29/16, and instead telling a LPN to monitor him;

i. Allowing Mr. Hartwell to be moved to the floor of his cell and left to suffer continuous seizures in his cell on November 29, 2016 through the early morning hours of November 30, 2016;

j. Failing to recommend policies, procedures, protocols, and/or guidelines and/or failing to implement and enforce policies, procedures, protocols, and/or guidelines that require nurses to contact a doctor or send prisoners to the ER rather than practice outside the scope of their licenses.

181.     Defendant's negligence, in whole or in part, was the proximate cause of Plaintiff's injuries and damages. "But for" the denial of necessary medications and medical care by qualified medical providers, Mr. Hartwell would not have been injured and damaged as set forth in Paragraph 131, *Supra*.

182.     Plaintiff reserves the right to request punitive damages under state law.


**SIXTH CLAIM FOR RELIEF**

**(Negligence – CMGC)**

183.     All of the above allegations are incorporated herein by reference.

184.     Defendants were negligent in their care and treatment of Mr. Hartwell, which negligence consisted, *inter alia,* in the following:

  a.  Failing to adequately train, supervise, and/or provide oversight to nursing staff to:

  - perform an initial health exam within the standard of care,

  - practice within the scope of their nursing licenses,

  - practice within a nursing standard of care,

  - obtain and administer medications that have been ordered by a physician,

  - follow all doctor's orders and document information accurately.

  - Call 911 in an emergency situation.

  b.  Failing to enact and/or implement and enforce policies, procedures, protocols and/or guidelines that require:

  - adequate staffing levels, including physician access;

  - nurses to practice within the scope of their licenses;

- contact with PCPs or the hospital to determine current medications and medical problems;

- documentation within the standard of care;

- Call 911 in an emergency situation.

    c.   Failing to do any investigation and make any changes to policies and procedures, training, supervision, or oversight of CMGC employees to prevent a recurrence of the same negligent actions in the future, and failing to hold anyone accountable.

185.    CMGC is liable for its own negligence that, in conjunction with the negligence of the other defendants, caused Plaintiff's injuries and damages as described in Paragraph 131, *Supra*.

186.    Plaintiff reserves the right to request punitive damages under state law.

<u>**SEVENTH CLAIM FOR RELIEF**</u>

**(Loss of Consortium – Barbara Hartwell)**

187.    All of the above allegations are incorporated herein by reference.

188.    As a proximate result of each Defendant's conduct, in whole or in part, and pursuant to Mr. Hartwell's claims under state law, Barbara Hartwell has been injured and damaged in the following particulars:

(a)    Mrs. Hartwell is now essentially married to a "different" person, and a more fragile person.  The husband she chose to live her life with is constantly fatigued, cognitively impaired, and always in fear of succumbing to another seizure and another bout of hospitalization.  Kevin Hartwell now requires frequent hospitalization for seizures that can no longer be controlled, and Mrs. Hartwell has become his caregiver.

(b)    Mrs. Hartwell has suffered a loss of companionship with the person she married, and loss of assistance with household services.

189.    Ms. Hartwell has suffered injuries and damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs pray for judgment to be entered against each of the Defendants, jointly and/or severally, in an amount sufficient to compensate Plaintiffs for all of their injuries, damages, and losses together with pre-judgment interest at the highest rate allowed by law, for attorney's fees, for punitive damages pursuant to Title 42 U.S.C. § 1988, and for litigation costs including expert witness fees, and they reserve the right to request exemplary damages for state law claims, and for such further relief as the Court deems just and equitable.

Dated this 9th day of November, 2018.

Respectfully submitted,

By:

/s/ Cheryl Trine
Cheryl Trine, #38150
Trine Law Firm LLC
155 E. Boardwalk Drive #400
Fort Collins, CO 80525
Phone: 970-391-9442
Fax: 970-458-1800
Email: ctrine@trinelaw.net


/s/ Phillip Chupik
Phillip Chupik, #30887
Metier Law Firm LLC
4828 South College Ave
Fort Collins, CO 80525
Phone: 970-377-3800
Fax: 970-2251476
 Email: phil@metierlaw.com

## PLAINTIFF DEMANDS TRIAL TO A JURY OF SIX PERSONS.

Plaintiffs' Address:
602 South Street, #A
Castle Rock, CO 80104

<u>**CERTIFICATE OF SERVICE**</u>

On this 8th day of November, 2018, I filed and served the foregoing document, via

CM/ECF and U.S. Mail upon the following:


Kelly Dunnaway, Esq.
Dawn Johnson, Esq.
Douglas County
100 Third Street
Castle Rock, CO 80104

Robert J. Zavaglia, Jr., Reg. No. 34974
Kathleen J. Johnson, Reg. No. 44524
TREECE ALFREY MUSAT P.C.
633 17th Street, Suite 2200
Denver, Colorado  80202
303.292.2700
303.295.0414 (facsimile)
zavaglia@tamlegal.com, kjohnson@tamlegal.com
*Attorneys for SCMG Defendants*

*/s/ Jacqui Salas*
*Jacqui Salas*